**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank SANTORA, Defendant-Appellant.**

No. 79–5382.

United States Court of Appeals,
Fifth Circuit.

June 23, 1980.

Rehearing Denied Aug. 4, 1980.

---

Platzer & Fallick, Barry M. Fallick, New York City, for defendant-appellant.

James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before VANCE and SAM D. JOHNSON, Circuit Judges, and THOMAS,* District Judge.

DANIEL HOLCOMBE THOMAS, District Judge:

Frank Santora appeals his convictions under 18 U.S.C. § 371 on one count of conspiracy to transport stolen securities in interstate commerce and under 18 U.S.C. § 2314 on one count of transporting stolen securities. Appellant contends that the trial court erred in denying his motion to suppress inculpatory evidence obtained during an investigatory stop. For reasons discussed below, we conclude that the evidence was properly admitted at trial; therefore, we affirm.

On February 8 and 9, 1979, the Federal Bureau of Investigation's confidential informant recorded several telephone conversations with one Marcello Stellato from the New York or Brooklyn area. The conversations concerned Stellato's proposal to sell negotiable securities in the form of municipal bonds which had been stolen on July 13, 1978, from Bradford Security in New York City to the informant at the Houston Intercontinental Airport on February 10, 1979. During this time the informant had also recorded a conversation which he had with another individual, also from the New York or Brooklyn area, who identified himself as "Frank" or "Frankie." In the course of this conversation "Frank" confirmed the amount of money to be paid for the securities and stated that he would be in Houston on February 10.

On the morning of February 10, 1979, Stellato telephoned the informant from the Houston Airport and arranged to meet him later that afternoon in the airport's Dobbs House coffee shop. Stellato described the clothing he would be wearing as a blue jacket, blue pants, and blue shirt. He also revealed that he would be carrying a tan overnight bag and would be alone.

Armed with all the above information, several F.B.I. agents, including McAuliffe,

---

* District Judge of the Southern District of Alabama, sitting by designation.

Canalez and McGauley, went to the Houston Airport on the afternoon of February 10 to investigate the suspected conspiracy involving the stolen bonds. From the description Stellato gave of himself, Agent Canalez was able to recognize him standing in front of the Dobbs House coffee shop. As Canalez approached the coffee shop he noticed a man,[1] later identified as Frank Santora, walk past the coffee shop two times before he went into the cocktail lounge across from the coffee shop to share a table with a man later identified as co-defendant Varrone.

While Stellato and the confidential informant, accompanied by a female agent, were seated in the coffee shop discussing the sale of the stolen bonds, Santora and Varrone sat at a table in the cocktail lounge where they were noticed by Agent McAuliffe. The entrance to the coffee shop and part of its interior could be observed from the defendant's table. Several times during the coffee shop meeting Santora and Varrone walked by the coffee shop and looked in and also looked toward the coffee shop while seated in the lounge.

After Stellato left the coffee shop meeting and was arrested in a different part of the terminal, the F.B.I. agents approached Santora and Varrone, revealed that they were F.B.I. agents, and asked for defendants' identification. Santora produced his New York driver's license which confirmed the fact that he was from the New York City area and that his first name was Frank. The defendants also complied with the agents' request that they empty their pockets and accompany the agents to a more private place on the lower level. At the lower level, Agent McGauley examined the contents of the pockets in more detail and discovered documents describing the stolen municipal bonds, a piece of paper bearing the confidential informant's initials and telephone number and a telephone book containing Stellato's telephone number. (Santora had earlier denied that he knew Stellato.) After an agent who had listened to the "Frank" tape and the confidential informant had identified Santora's voice as that of "Frank" and the pocket contents had been examined, Santora and Varrone were formally placed under arrest and given the *Miranda* warnings.

Prior to his trial Santora filed a motion to suppress all of the evidence obtained from him during the investigatory stop in the Houston Airport. After a hearing, this motion to suppress was denied by the district judge.[2]

---

1. At the suppression hearing the F.B.I. agents articulated the factors which attracted their attention to Santora:

   Canalez:
   There were no other real factors besides the clothes he was wearing, the fact that he was walking by the coffee shop slowly and looking in the coffee shop, the hairstyle, the fact that he appeared to be, what I would consider to be, of Italian ancestory [*sic*].
   Record, Vol. 1, at 96.
   McAuliffe:
   Q [A]nd you thought that somebody was going to be along for the proposed seller of these stolen securities. That's the one factor and this person had walked by, in a one-hour period, past the coffee shop two times glancing in, and the person had sat at a table and glanced toward the coffee shop; is that correct? Those three things, right?
   A The person was with another individual that was walking around separately from him.
   Q Okay. You want to add that as a fourth factor that the other person with him walked by the coffee shop one time?
   A At least once that I can recall independently or separately.
   Q Okay. And that is it; correct:
   A I mean—yes, basically, that's correct. Record, Vol. 1, at 177.
   McGauley:
   I would have to say also that I was looking for an individual from New York. I would have to say that Mr. Santora fit the part of maybe an Italian or of Italian descent and I certainly found a key fit to what I felt like I was looking for.
   Then when he made the observation and the surveillance of the Dobbs Coffee House, I felt he certainly deserved to be one.
   Record, Vol. 2, at 255.

2. The suppression hearing resulted in the following findings of fact.

   1. The FBI agent's action in their initial interview of Santora and Varrone in asking Santora and Varrone to identify themselves in the bar was reasonable, supported by probable cause, and not an illegal search, seizure or arrest.

On May 29, 1979, Santora and Varrone went to trial, the result of which was that Santora was found guilty of both counts contained in the indictment, while Varrone was acquitted of both counts. Stellato had earlier entered a plea of guilty. On July 9, 1979, Santora was sentenced to three years imprisonment on each count with the sentences to run consecutively.

Defendant Santora appeals, contending that the investigatory stop was illegal and that the evidence obtained during the stop was tainted by that initial illegality and, therefore, should have been suppressed under the "fruit of the poisonous tree" doctrine. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Ballard,* 573 F.2d 913 (5th Cir. 1978).

■ There is no doubt that the confrontation of Santora and Varrone by the F.B.I. agents constituted a "stop" as contemplated by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The controlling issue in this case, then, is whether the initial stop was a lawful investigatory stop. A *Terry* stop of an individual is lawful if it is based on a reasonable suspicion that the person is involved with criminal activity. *Id.* Furthermore, that reasonable suspicion of criminal activity must stem from specific articulable facts. *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

■ Both the government and the appellant articulate five specific facts which we find sufficient for reasonable suspicion that Santora was involved with criminal activity and, thus, justify the initial stop. These are stated as:

(1) the same color of clothing as Stellato

(2) his Italian appearance and hairstyle

(3) a belief that Stellato would be accompanied by other individuals

(4) Santora twice within one hour walking past the coffee shop and looking inside and

(5) looking toward the coffee shop while seated in the lounge.

Brief for Appellee at 6 and Brief for Appellant at 12.

The first two items listed involve the similarity of appearance of Santora and Varrone to that of Stellato, who was known to be involved in criminal activity. The agents also knew how Stellato would be dressed and were aware that his name was an Italian name. It was not unreasonable for the agent to suspect that Stellato's companions might be of similar ancestry. Therefore, it was reasonable for the agents to focus on two men similarly dressed in a manner consistent with the image of an Italian-American from the New York area.[3] The Texas trial judge may well have concluded that men so dressed would be as conspicuous in the Houston Airport as two Texans, similarly dressed in a manner con-

2. Neither Santora nor Varrone was physically restrained in the bar. There is no evidence and no basis for a conclusion, as to what would have occurred had Santora and Varrone attempted to leave rather than engaging in conversation with the officers.

3. The action of the FBI agents in requesting Santora and Varrone to go with them from the bar area to the baggage area of the airport terminal was a reasonable action, was not an unreasonable search and seizure, and did not constitute an arrest.

4. There is no evidence and no basis for a conclusion as to what would have occurred had Santora and Varrone, during the trip to the baggage area, simply walked away and refused to cooperate further with the FBI agents.

5. After examining the contents of Santora's and Varrone's pockets, and identifying Frank Santora's voice as the "Frank" on the tape, there was clearly probable cause for an arrest, and arrest thereafter was entirely proper.

6. Santora and Varrone have not been the victims of an unlawful arrest, or an illegal search and seizure.

Memorandum Opinion and Findings of Fact Concerning Motion to Suppress Documentary Material Taken from the Persons of Frank Santora, Jr., and Joseph Anthony Varrone. Record Excerpts at 17.

3. At least one of the F.B.I. agents involved in the airport surveillance had worked in the New York area and felt that he could identify Italian-Americans from the New York area with some degree of certainty. Brief for Appellee at 4.

sistent with the image of a Texan would be in an eastern airport.

The third articulated fact was based on the taped telephone conversation which the confidential informant received from "Frank" who stated that he would be coming to Houston at the same time as Stellato. Appellant argues that Stellato's statement that he would be alone at the coffee shop meeting should eliminate this fact from the agents' consideration. We do not agree. It was reasonable for the agents to suspect that "Frank" would be present at the airport though not present at the coffee shop meeting. The obvious interest of Santora and Varrone in the coffee shop meeting, evidenced by their strolling past, looking in, and watching from the lounge, also gave the agents cause to be reasonably suspicious.

Appellant argues that these five articulated facts are insufficient to create a reasonable suspicion that Santora was engaged in criminal activity and relies on the cases of *United States v. Ballard*, 573 F.2d 913 (5th Cir. 1978), and *United States v. Beck*, 602 F.2d 726 (5th Cir. 1979), cases which held no reasonable suspicion to justify the investigatory stops. These two cases can be distinguished from the instant case on the facts.

In *Ballard*, the agents received an anonymous tip from a drug unit that a black man, five feet eight inches tall, weighing 140 pounds, and having a thin face and torso would be arriving at the New Orleans Airport on a flight from Los Angeles. The agents stopped a black man, six feet tall and weighing 170 pounds, because he was carrying limited luggage, seemed nervous, and was walking rapidly through the airport. The stop was held to violate the fourth amendment because of insufficient factors for reasonable suspicion of criminal activity. 573 F.2d at 916.

In *Beck*, the illegal stop occurred when police officers in a patrol car passing through a predominantly black, high-crime neighborhood noticed an automobile containing two black males parked on the side of the road with its engine running about one block from a convenience store. One of the officers testified that he knew almost everyone who lived in the community and that he failed to recognize either of the two black men in the car. The initial stop occurred when the officers pulled their patrol car alongside the parked car, blocking the vehicle, and began to question the occupants. The court held the stop clearly illegal because there is nothing inherently suspicious about two black men sitting in a parked car, with or without the engine running, on a street in a black neighborhood on a midsummer afternoon. 602 F.2d at 729.

■ Appellant raises a second issue in his brief, contending that the government's direct examination of its own witness was improper and prejudicial because it was an attempt to link the defendant to organized crime. We find this contention to be without merit. The direct examination in question was that of a prosecution witness, an attorney who was asked to give his former employment. The question was a preliminary one, the purpose of which was to establish the witness' first hand knowledge of a prior conviction of co-defendant Varrone, not of Santora. In responding to the question the witness referred to the Organized Crime Section of the F.B.I. and the trial judge instructed the jury to disregard the reference. Record, Vol. 2, p. 428. No prejudice to Santora has been demonstrated.

■ Having held that the facts known to the F.B.I. agents were sufficient for a lawful investigatory stop and that the subsequently obtained evidence was not tainted by the illegality of the stop, we must affirm the trial judge's decision to admit the evidence.

AFFIRMED.