**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Sherman Major BOWLES,
Defendant-Appellant.**

No. 79–5088.

United States Court of Appeals,
Fifth Circuit.

Sept. 2, 1980.

Roney, Circuit Judge, concurred specially and filed opinion.

Before GODBOLD, RONEY and FRANK M. JOHNSON, Jr., Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

Sherman Major Bowles appeals his conviction in the United States District Court for the Northern District of Georgia of two counts of possessing a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Bowles' prosecution arose out of an encounter between Bowles and three law enforcement officials at Atlanta's Hartsfield International Airport on May 2, 1978. As a result of that encounter, the officers discovered that at the time Bowles carried heroin and cocaine on his person. In due course Bowles was tried before the court, convicted, and sentenced.[1]

Bowles' entire defense, on appeal as well as below, hinges on the contention that the contraband seized from him was inadmissible as evidence against him because it was obtained in violation of his constitutional rights. After conducting a suppression hearing on the question, the United States Magistrate found the evidence properly admissible. The district court held a de novo hearing and affirmed the magistrate's determination. We, too, conclude that the evidence was admissible and, accordingly, affirm.

I.

In order to reduce the flow of narcotics into and through Atlanta, the Drug Enforcement Administration (DEA) has established an enforcement program at Hartsfield Airport. The program includes what are termed "on-site" investigations at the airport and of the people who use it.

On May 2, 1978, at approximately 7:15 p. m., DEA Special Agent Michael Dorsett, Detective B. A. Glover of the Atlanta Police Department, and United States Customs Officer Larry Brown, while conducting such

Ron Minkin, Los Angeles, Cal., for defendant-appellant.

Robert A. Boas, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

---

1. Bowles received consecutive fifteen and ten year sentences to be followed by a ten year special mandatory parole term.

"on-site" surveillance, observed passengers deplane from a non-stop flight that had just arrived from Los Angeles. The officers first noticed appellant as he followed a short distance behind two other black men who had also been on the plane. Initially the three did not appear to be together and were no cause of interest. However, Agent Dorsett's curiosity was piqued when all three proceeded down the concourse, Bowles still trailing slightly, and joined a line of passengers waiting to check in at the gate for a plane leaving for Chattanooga, Tennessee. At that point Dorsett determined to investigate further. He waited in line at the gate behind the three men and, after they had checked in and walked away from the gate in the same direction they had been traveling, Dorsett asked the gate attendant for some information concerning their tickets. Dorsett learned that the two men were traveling on tickets in the names of Charles and Tommy Watson (their tickets were in the same folder) and appellant's ticket was in the name of M. Bowles.

After talking with the agent at the gate, Dorsett hurried down the corridor to catch up with Glover and Brown. As the officers waited in the concourse, the "Watsons" and Bowles, walking a discreet distance behind, entered the men's restroom. A few minutes later the three emerged.

The seeming unawareness of the "Watsons" to Bowles' presence as all three continued on identical courses in close proximity initially aroused Dorsett's interest. As the three came out of the restroom, however, they appeared for the first time to be together. They walked "very, very slowly," "practically shoulder-to-shoulder" down the corridor. Moreover, the three men acknowledged the presence of the plainclothed officers. Agent Dorsett testified that:

> All three of the men began to look directly at myself. They walked within a few feet of where I was sitting on the edge of the concourse there and glared at me, stared at me. They walked down to where the concourse made a turn to the right and at that point all three of them

turned and looked back over their shoulders directly at me.

Officers Dorsett, Glover, and Brown reached the turn only thirty to forty feet behind the "Watsons" and Bowles. As the officers rounded the corner they were "confronted" just a few feet ahead by the "Watsons." The two men had turned facing the officers and stood abreast in the center of the concourse, blocking the path. According to Dorsett, the two were "standing there staring at me quite hostilely." Bowles, however, had left his companions and continued down the concourse. In sharp contrast to the speed at which the three had been walking, Bowles had quickened his pace considerably to "just short of a run."

After directing Detective Glover to check on Bowles, Dorsett approached the "Watsons." He presented his identification and told them that he was a federal agent conducting a narcotics investigation. Dorsett noticed almost immediately a marked change in the demeanor of the two men. The became cooperative when Dorsett asked for identification. The hostility apparently was replaced with nervousness for Dorsett testified that when they produced identification their hands were shaking. Driver's licenses indicated that their names were Charles Lamar Watson and Ithornial Maffet. Dorsett recognized Maffet's name as "a major heroin dealer in the Chattanooga, Tennessee area." Agent Dorsett then requested their airline tickets and asked why Maffet's ticket was in the wrong name. Watson replied that he and Maffet were half brothers and that their father had purchased the tickets. In response to a question by Agent Dorsett, Maffet and Watson said that they were not carrying narcotics. Agent Dorsett then asked them:

> if they would consent to a search of their person[s] and they said they would. I advised them that they were not under any obligation. They did not have to [consent to] the search. They stated that they would just like to get it over with.

Watson and Maffet agreed to go with Dorsett to the DEA office for the search. Offi-

cers Dorsett and Brown then proceeded down the concourse with Maffet and Watson to where Bowles and Detective Glover were standing.

Detective Glover testified that, after Agent Dorsett instructed him to approach Bowles, Glover walked at a fast rate to catch up with the suspect. Glover passed Bowles, who was still walking rapidly, and turned toward him, standing in his line of travel. Glover "had [his] identification out and . . . asked him if [Glover] could talk with him for a moment." Glover identified himself as part of a federal task force and informed Bowles that he was conducting a narcotics investigation. Glover requested Bowles' airline ticket which Bowles produced with shaking hands. The ticket, as noted above, was in the name of M. Bowles. Glover then asked Bowles for some form of identification and Bowles gave him a Tennessee identification card with the name Sherman Major Bowles, a name Glover recognized as being "narcotics-related" in the Atlanta area. After further questioning by Detective Glover, Bowles indicated that he was not carrying any narcotics and that he would consent to a search. After a short pause, however, Bowles said " 'I'd rather not do it [the search] here in the concourse.' [Glover] explained to him that [the DEA] had an office on the lower level there in the terminal building if he'd rather go down there, which he said he had [sic] rather go down there."

At this point Watson and Maffet approached, accompanied by the two officers. Dorsett asked Watson and Maffet whether they knew Bowles and they said that they did not; Glover asked Bowles whether he knew Maffet and Watson and Bowles indicated that he did not. The group then proceeded down the concourse to the DEA office.

After they had entered the DEA office, Agent Dorsett addressed Watson, Maffet, and Bowles. Reading from "a little card," Dorsett advised them that they were not under arrest, that they were under no obligation to consent to the search, and that they could refuse the search if they so de-

sired." Dorsett asked all three "individually" if they understood and all three answered yes. Maffet and Watson both consented and were given pat down searches that yielded no contraband. Agent Dorsett then approached Bowles who remained seated in a chair. Addressing Bowles specifically, Dorsett asked Bowles if he would consent to a search and again informed Bowles that he had a right to refuse consent. Agent Dorsett testified that:

> [Bowles] just sat there and I asked if he understood. He stood up. He did not say anything. Once again I asked him. I said, "Do you understand? I'm asking for your consent [to] search." I said, "Will you consent to it? You do not have to." At that point in time he just sort of raised his hands out and just sort of nodded his head, like, "Yeah, um"—sort of grunted. Like: Go ahead. Held his hands out . . . .

Bowles had a jumble of papers in the pocket of his leisure suit and Dorsett removed them. In the pocket was also a small, partially-consumed block of manite, an Italian laxative that Dorsett knew from his experience as a narcotics agent was used as a "cutting agent" (dilutant) for both heroin and cocaine. Dorsett continued to pat down Bowles and felt an unnatural bulge just below Bowles' belt in the groin area. At Dorsett's direction Bowles lowered his pants and underwear and a package four inches square and wrapped in masking tape fell to the floor. The officers then opened the package and discovered smaller packages of powder wrapped in clear plastic. Bowles was then placed under arrest and handcuffed. The packages proved to contain 61.7 grams of heroin and 8.2 grams of cocaine.

## II.

A. In analyzing the admissibility of the narcotics obtained from Bowles, our first task is to characterize the initial encounter between Bowles and Detective Glover in order to determine the degree of protection, if any, afforded Bowles by the proscription of the Fourth Amendment against "unrea-

sonable" searches and seizures. The government contends that the meeting of Bowles and Glover was of that genus of police-citizen contacts wholly outside the scope of Fourth Amendment protections. We decline to adopt that view.

The government's position has to commend it the decision of this Court in *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 2998, 65 L.Ed.2d —— (1980) (two justices dissenting), and the views of at least two justices of the Supreme Court in the recently decided *United States v. Mendenhall*, —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

In *Mendenhall*, the Supreme Court considered factual circumstances closely analogous to those presented here.[2] Two DEA agents on duty at the Detroit airport observed Ms. Mendenhall, the last passenger to disembark from a plane that had just arrived from Los Angeles. Her behavior attracted the attention of the agents and they followed her. After a time, they approached her on the concourse and identified themselves as federal agents. They requested to see her ticket and some identification, which she produced, and asked her a few questions. Thereafter the agents accompanied Ms. Mendenhall to the airport DEA office and a subsequent body search revealed that she was carrying heroin. *Id.* at —— – ——, 100 S.Ct. at 1872–1875.

The Supreme Court reversed and remanded, holding that the Court of Appeals for the Sixth Circuit had erred in reversing Ms. Mendenhall's conviction. Five members of the Court—Justice Stewart, Chief Justice Burger, Justice Blackmun, Justice Powell, and Justice Rehnquist—discerned nothing constitutionally impermissible in the agents' contact with Ms. Mendenhall. The five, however, did not reach that conclusion via the same route.

The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, "including seizures that involve only a brief detention short of traditional arrest. *Davis v. Mississippi*, 394 U.S. 721 [89 S.Ct. 1394, 22 L.Ed.2d 676] (1969); *Terry v. Ohio*, 392 U.S. 1, 16–19 [88 S.Ct. 1868, 1877–1878, 20 L.Ed.2d 889] (1968)." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 [95 S.Ct. 2574, 2578, 45 L.Ed.2d 607] [1975]. . . . But "[o]bviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, as in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio, supra*, [392 U.S.] at 19, n. 16 [88 S.Ct. at 1879, n. 16]. *Id.* at —— – ——, 100 S.Ct. at 1875 (footnote omitted).

Justice Stewart, joined by Justice Rehnquist, proposed a test for determining whether a Fourth Amendment "seizure" has occurred during a police-citizen contact. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at ——, 100 S.Ct. at 1877 (footnote omitted); *see United States v. Elmore, supra*, 595 F.2d at 1042; *United States v. Wylie*, 569 F.2d 62, 68 (D.C.Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). Applying that test to the facts of the case, Justices Stewart and Rehnquist concluded that the Fourth Amendment was not implicated by the initial encounter between the agents and Ms. Mendenhall. *United States v. Mendenhall, supra*, —— U.S. at ——, 100 S.Ct. at 1876. "The respondent was not seized simply by reason of the fact that the agents ap-

---

**2.** Unfortunately, because of the fragmentation of the *Mendenhall* Court, we are guided by little beyond the result of the case. *See Reid v. Georgia*, —— U.S. ——, 100 S.Ct. 2752, 65 L.Ed. —— (1980) (per curiam). In *Reid*, the Court considered a DEA-citizen contact at the Atlanta airport. Although the case presented the Court

with its first opportunity to construe *Mendenhall*, the Court failed to cite *Mendenhall*. Justice Powell, joined by the Chief Justice and Justice Blackmun, concurred and stated that the facts were "remarkably similar" to those in *Mendenhall. Id.* at ——, 100 S.Ct. at 2753.

proached her, asked her if she would show them her ticket and identification, and posed to her a few questions." *Id.* at ——, 100 S.Ct. at 1877.

The rest of the Court declined to reach the seizure issue, although no member quarreled specifically with the test propounded by Justice Stewart. *See id.* at —— & n. 1, 100 S.Ct. at 1880 & n. 1 (Powell, J., concurring in part and concurring in the judgment); *id.* at ——–——, 100 S.Ct. at 1883–1886 (White, J., dissenting). In dissent, Justice White, joined by Justices Brennan, Marshall, and Stevens, objected vigorously to Justice Stewart's consideration of the issue in a situation in which the government had conceded before the district court and again before the court of appeals that the suspect had been seized. *Id.* at —— & nn. 1 & 2, 100 S.Ct. at 1884 & nn. 1 & 2 (White, J., dissenting). Justice Powell, joined by the Chief Justice and Justice Blackmun, also declined to reach the question whether Ms. Mendenhall had been seized and assumed that a seizure had occurred. *Id.* at ——, 100 S.Ct. at 1880 (Powell, J., concurring in part and concurring in the judgment).[3] Justice Powell noted that he did not "necessarily disagree" with the views of Justice Stewart, but stated that, "[f]or me, the question whether the respon-·dent in this case reasonably could have thought she was free to 'walk away' . . is extremely close." *Id.* at —— n. 1, 100 S.Ct. at 1880 n. 1.

Despite the refusal of seven members of the Supreme Court to confront the question whether police-citizen contact of the sort involved in *Mendenhall*, and here, constitutes a seizure within the meaning of the Fourth Amendment, we would, of course, be bound by a clear ruling on the issue by this Court. *See, e. g., Ford v. United States*, 618 F.2d 357, 361 (5th Cir. 1980); *Trunkline Gas Co. v. Federal Energy Regulatory Comm'n*, 608 F.2d 582, 583 (5th Cir.

1979); *Puckett v. Commissioner*, 522 F.2d 1385, 1385 (5th Cir. 1975). In *United States v. Elmore, supra,* this Court reached the seizure question and held, under the facts of that case, that the initial contact between the officers and defendant was not a Fourth Amendment seizure. 595 F.2d at 1042. The facts and circumstances of *Elmore*, however, are clearly distinguishable from those of the present case.

In *Elmore* DEA agents, again at Hartsfield Airport on routine duty, observed Mr. Elmore walking along the corridor. His manner of behavior caused the agents to follow him. He walked into a nearly empty gate area and then back out, resuming his course down the corridor. He "looked back" a number of times, walked in and out of two airport stores "without making a purchase or stopping for a more specific look at any of the merchandise," and then proceeded to another gate, checked in for the flight, and took a seat. The agents approached Elmore, who was still seated in the gate area, identified themselves as federal officers, asked to see his airline ticket, and then requested further identification. As the officers and their suspect continued their conversation, the agents grew more and more suspicious, until one of them took the airline ticket out of the area to a ticket agent in order to check information against that provided by Elmore. *Id.* at 1037–38. The district court adopted the determination of the magistrate that, until Elmore's ticket was removed from the immediate vicinity, there was no Fourth Amendment seizure. This Court held that "the District Court could have reasonably concluded (as it did) that no seizure occurred until [the agent] carried Elmore's ticket away . . ." *Id.* at 1042.[4]

The *Elmore* Court recognized that "any restraint on movement" is sufficient to constitute a seizure, *United States v. Robinson*, 535 F.2d 881, 883 & n. 2 (5th Cir. 1976), and

---

**3.** Similarly, in *Reid v. Georgia, supra,* the Court assumed that a police-citizen encounter at the Atlanta airport constituted a seizure where the issue had not been contested below. *See* —— U.S. at ——, 100 S.Ct. 2752, 65 L.Ed.2d ——; *id.* at ——, 100 S.Ct. at 2752 (Powell, J., concurring); *but see id.* at ——, 100 S.Ct. at 2752 (Rehnquist, J., dissenting).

**4.** Under the test advocated by Justice Stewart for determining whether there has been a Fourth Amendment seizure, the court must look to "all of the circumstances surrounding the incident." *United States v. Mendenhall, supra,* —— U.S. at ——, 100 S.Ct. at 1877. Nevertheless, the decision whether the Fourth Amendment is implicated by a particular po-

that "seizures have been found when an encounter is precipitated by a show of authority, such as when a siren was used to pull a motorist over . . . ." 595 F.2d at 1041 [citing *United States v. Ward*, 488 F.2d 162, 168–70 (9th Cir. 1973) (en banc)]; *see also Delaware v. Prouse*, 440 U.S. 648, 650, 653, 99 S.Ct. 1391, 1394, 1396, 59 L.Ed. 660 (1979); *United States v. McDaniel*, 550 F.2d 214, 216–17 (5th Cir. 1977); *United States v. Harris*, 528 F.2d 1327, 1329 (8th Cir. 1975). Nevertheless, the Court deemed that line of authority inapplicable to the circumstances before it in *Elmore.*

■ We find the facts of the present case more closely analogous to situations in which "by a show of authority"—flashing lights or sirens—police stop an automobile traveling on the roadway than to a circumstance in which law enforcement officials approach a seated individual. As Detective Glover pursued Bowles, he passed his quarry, held out his credentials and turned to face defendant, blocking his path and stopping him from proceeding further. Clearly at this point Bowles' movement had been restrained. *United States v. Robinson, supra*, 535 F.2d at 883 & n. 2.[5] Bowles was seized.[6]

■ B. Having concluded that Detective Glover's encounter with Bowles was a

---

lice-citizen contact is a legal conclusion to be based on the "facts appearing in the record . . . ." *Id.* at —— n. 5, 100 S.Ct. at 1876 n. 5; *see United States v. Coates*, 495 F.2d 160, 163 (D.C.Cir.1974).

5. Even if the facts of the present case were virtually the same as those in *Elmore, United States v. Santora*, 619 F.2d 1052 (5th Cir. 1980), seriously undercuts the holding in *Elmore.* In *Santora*, FBI agents approached two men sitting in an airport terminal coffee shop. The agents identified themselves and asked for identification. *Id.* at 1054. The Court found that there was "no doubt" that the "confrontation" constituted a Fourth Amendment seizure. *Id.* at 1055.

6. Although we would hold that Bowles was seized solely on the circumstances of the stop, we also find persuasive the comments of the four dissenters in *Mendenhall, supra*. In *Elmore*, the consideration whether the contact in the airport between defendant and the DEA agents constituted a Fourth Amendment seizure began before the magistrate. On the other hand, in the present case, before the magistrate and again before the district court at the de novo suppression hearing, the government conceded that Bowles had been seized and that he was under "investigative detention" and not "free to go." Brief in opposition to motion to suppress at 26 n. *, Record on Appeal at 68. Justice White in dissent in *Mendenhall* strongly criticized Justices Stewart and Rehnquist for addressing "a fact-bound question with a totality-of-circumstances assessment that is best left in the first instance to the trial court, particularly since the question was not litigated below and hence we cannot be sure is adequately addressed by the record before us." —— U.S. at ——, 100 S.Ct. at 1885. (White, J., dissenting) (footnote omitted).

We agree with the *Mendenhall* dissent on the importance of establishing an adequate record in order to determine the seizure question. Because of the government's concession below that a seizure had occurred, the magistrate and district court, and the attorneys involved, failed carefully to elicit and weigh factual circumstances that would bear on the issue whether Bowles was seized. *See id.* at ——, —— & nn. 2–4, 100 S.Ct. at 1884–85 & nn. 2–4 (White, J., dissenting).

The discussion above focused on the issue whether the encounter between Bowles and Glover was wholly outside the purview of the Fourth Amendment or whether it was a seizure that, although "less intrusive than a traditional arrest," *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979), must still meet the requirements of the Fourth Amendment. Because of the closeness of the seizure question, *see United States v. Mendenhall, supra*, —— U.S. at —— n. 1, 100 S.Ct. at 1880 n. 1 (Powell, J., concurring in part and concurring in the judgment), little discussion is necessary concerning Bowles' argument that the stop constituted an arrest subject to the probable cause standard. The facts indicate that the encounter, if reasonable, was merely a "brief stop of a suspicious individual, in order to *determine his identity or to maintain the status quo momentarily* while obtaining more information . . . ." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (emphasis added). Such a seizure does not constitute an arrest. Other circumstances exhibiting more intrusive seizures than the one involved here have been held not to be arrests and not to have required probable cause. *See, e. g., United States v. Oates*, 560 F.2d 45, 57 (2d Cir. 1977) (officers told suspect to "come with us.") ("[A]lthough every arrest is a form of detention, the converse is not true."); *United States v. Worthington*, 544 F.2d 1275, 1280 n. 3 (5th Cir.), *cert.*

Fourth Amendment seizure, we must determine whether that seizure comported with the reasonableness standard imposed by the amendment. In the present case, the magistrate held that Detective Glover's stop of Bowles was not reasonable under the circumstances and therefore violated Bowles' Fourth Amendment rights. After conducting a de novo hearing on the admissibility of the evidence, however, the district court expressed disagreement with the magistrate's conclusion.[7] We hold that the stop of Sherman Major Bowles was within constitutional bounds.

All nine justices in *Mendenhall* appeared to concur on the legal standard that governs a determination of reasonableness; if the agents' encounter with Ms. Mendenhall constituted a seizure, it was permissible only if it was based upon reasonable suspicion that she was involved in criminal activity. *United States v. Mendenhall, supra,* —— U.S. at ——, 100 S.Ct. at 1876; *id.* at ——, 100 S.Ct. at 1886 (White, J., dissenting); *see id.* at ——, 100 S.Ct. at 1882 (Powell, J., concurring in part and concurring in the judgment). Nevertheless, no majority of the court could agree on the application of the standard to the facts of the case.[8] Of course, the "reasonableness of a stop turns on the facts and circumstances of each case." *Id.* at ——, 100 S.Ct. at

1881 (Powell, J., concurring in part and concurring in the judgment). The facts of the present case are sufficiently distinguishable from those in *Mendenhall* for us to be confident in holding the stop reasonable under the Fourth Amendment.

Reasonable suspicion must be based upon "specific articulable facts, together with rational inferences from those facts" known at the time of the stop to the officers effecting the stop. *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); *United States v. Mendenhall, supra,* —— U.S. at ——, 100 S.Ct. at 1886 (White, J., dissenting); *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed. 889 (1968). In assessing the facts and inferences, however, we must remain mindful that trained law enforcement officers "may be 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.'" *United States v. Mendenhall, supra,* —— U.S. at ——, 100 S.Ct. at 1882 (Powell, J., concurring in part and concurring in the judgment) [quoting *Brown v. Texas, supra,* 443 U.S. at 52 n. 2, 99 S.Ct. at 2641 n. 2]. Accordingly, " 'the officer is entitled to assess the facts in light of his experience.'" *Id.* at ——, 100 S.Ct.

denied, 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977) ("An investigatory stop is not automatically an arrest simply because an officer draws his [automatic rifle and aims at the suspect]."); *United States v. Hall,* 525 F.2d 857, 859 (D.C. Cir.1976); *United States v. Coates, supra,* 495 F.2d at 163 (uniformed officer shouted "Hold it" to fleeing suspect).

7. Although the magistrate held the stop unreasonable, he ultimately concluded that the evidence was admissible. *See* part III *infra.* Because of this bottom-line determination, the district court affirmed the magistrate. As the court stated in overruling the motion to suppress, "doing it that way [affirming the magistrate], I don't really need to get into the question of the stop. If I had to, I think I would rule that the stop was permissible." The fact that the district court did not overrule the magistrate's conclusion concerning the reasonableness of the stop does not affect our analysis. Under the Fourth Amendment the determination of the reasonableness of a seizure is a conclusion of law. *United States v. Mendenhall, supra,* —— U.S. at —— n. 5, 100 S.Ct. at

1883 n. 5 (Powell, J., concurring in part and concurring in the judgment).

8. A plurality of the Court, the four dissenters, concluded that the stop of *Mendenhall* was not reasonable. *Id.* at ——, 100 S.Ct. at 1886 (White, J., dissenting). Justices Stewart and Rehnquist found no occasion to consider the question because in their view there was no intrusion upon any interest protected by the Fourth Amendment. *Id.* at ——, 100 S.Ct. at 1876. The remaining three members of the Court reached the issue whether the stop was reasonable under the Fourth Amendment and decided that it was. *Id.* at ——, 100 S.Ct. at 1882 (Powell, J., concurring in part and concurring in the judgment). *See also Reid v. Georgia, supra,* in which the eight Justices who considered the issue determined that the seizure of Mr. Reid was without constitutional justification. —— U.S. at ——, 100 S.Ct. at 2752; *id.* at —— n. 1, 100 S.Ct. at 2753 n. 1 (Powell, J., concurring).

at 1882 (Powell, J., concurring in part and concurring in the judgment) [quoting *United States v. Brignoni-Ponce, supra,* 422 U.S. at 885, 95 S.Ct. at 2582].

In *Mendenhall* the DEA agents based their claim of justification for the stop of Ms. Mendenhall on several factors. As in the present case, the suspect departed from an airline flight that had just arrived from Los Angeles. Moreover, she was the last passenger to disembark from the plane and, as she entered the terminal, she " 'appeared to be very nervous' " and " 'completely scanned the whole area where [the agents] were standing.' " She then proceeded past the baggage area without claiming any luggage and then switched airlines for her flight out of Detroit. *Id.* at —— n. 1, 100 S.Ct. at 1873 n. 1. For Justice Powell, these facts were sufficient to raise a reasonable suspicion that Ms. Mendenhall was committing a crime.[9] *Id.* at ——, 100 S.Ct. at 1879 (Powell, J., concurring in part and concurring in the judgment).

That Bowles disembarked from a flight that had just landed from Los Angeles could clearly never be sufficient alone to create reasonable suspicion. Nevertheless, it is certainly not an insignificant factor. Indeed, the fact that the plane had arrived non-stop from Los Angeles explains the agents' presence at the gate at which Bowles arrived. Policing the flow of heroin is the DEA's number one narcotics enforcement priority. The primary source city for heroin coming into the Atlanta airport is Los Angeles.[10]

Bowles' arrival from Los Angeles can be considered. *See id.* at ——, 100 S.Ct. at 1880 (Powell, J., concurring in part and concurring in the judgment); *United States v. Klein,* 592 F.2d 909, 912 (5th Cir. 1979). Nevertheless, Agent Dorsett, an experienced drug enforcement officer, did not decide to investigate further until he had observed Bowles' conduct. Bowles came off the plane, proceeded down the concourse, checked in at a gate for a flight to Chattanooga, and then walked farther down the corridor and into the restroom. Until this point, for the entire time since he had landed, he had followed fairly closely behind two other men who happened to be taking exactly the same course as he. Even so, although they had occupied the same plane from Los Angeles, disembarked in close proximity, and were all three headed to Chattanooga, the testimony reflected that Bowles remained some distance behind the other two who appeared to be unaware of him until after going into the restroom. Both the testimony of Agent Dorsett and that of the DEA special agent who initiated the DEA airport programs in Detroit and Atlanta[11] indicated that frequently drug

---

**9.** Of course, as the *Mendenhall* dissenters pointed out, anything unusual about Ms. Mendenhall's failure to pick up luggage at the baggage claim area was negated when the agents discovered that Ms. Mendenhall was merely changing planes in Detroit. *Id.* at —— & n. 9, at 1887 & n. 9 (White, J., dissenting).

**10.** Expert testimony introduced at Bowles' suppression hearing detailed the operation and success of the DEA program at Hartsfield airport. The program began in 1977 and in its first seven months produced over thirteen pounds of heroin, nineteen pounds of cocaine, more than twenty thousand dosage units of assorted other drugs, and nearly one hundred pounds of marijuana. In those seven months the DEA was involved in seventy two search situations; in forty eight, a full two thirds, contraband was seized. Eighteen of the forty eight searches yielded heroin and, of those, in thirteen (72.2%) the heroin came from Los Angeles. Of those searches (twenty four) that did not produce contraband, in sixteen there was evidence of involvement in drug-related or other criminal activity. In only eight of seventy two was no evidence of wrongdoing discovered.

**11.** Special Agent Paul Markonni of the DEA testified in person at the suppression hearing concerning the operation of the Atlanta airport program conducted by the DEA. Agent Markonni was one of the initiators of the Detroit airport DEA program discussed in *Mendenhall* by Justice Powell. *See United States v. Mendenhall, supra* —— U.S. at —— – —— & n. 4, 100 S.Ct. at 1880–82 & n. 4 (Powell, J., concurring in part and concurring in the judgment). Later, Agent Markonni was transferred to Atlanta to aid in the establishment of a similar airport program. By stipulation, testimony of Agent Markonni from *United States v. Paul Key* another criminal case in the Northern District of Georgia, was also introduced at the hearing. In his *Key* testimony, Agent Markon-

couriers travel with others but attempt to conceal their association. Moreover, several cases have considered such efforts to hide association as factors contributing to reasonable suspicion that there is criminal activity afoot. *See United States v. Vasquez*, 612 F.2d 1338, 1342–43 (2d Cir. 1979); *United States v. Rico*, 594 F.2d 320, 325 (2d Cir. 1979); *United States v. Walters*, 591 F.2d 1195, 1199 (5th Cir.), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 6 L.Ed.2d 317 (1979); *United States v. Riggs*, 474 F.2d 699, 703 (2d Cir.), *cert. denied*, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973); *United States v. Fields*, 458 F.2d 1194, 1196 (3d Cir. 1972), *cert. denied*, 412 U.S. 927, 93 S.Ct. 2755, 37 L.Ed.2d 154 (1973).

Although when the three men walked into the restroom Agent Dorsett may have had only a hunch that they were purposely concealing their association, when they came out of the restroom this hunch was confirmed. Not only did they appear to be together, the three acted in concert with respect to a perceived threat—the three plain-clothed officers. As the suspects walked together very slowly out of the restroom and away from the gate from which their flight to Chattanooga was to leave, they in unison turned to stare at the officers. Moreover, as they reached the curve in the concourse, they turned once more to stare at the officers. Moments later, Watson and Maffet confronted Agent Dorsett and his partners as Bowles scurried down the concourse.

This behavior clearly gave Agent Dorsett and Detective Glover reasonable suspicion. The actions of the three men confirmed suspicions that they had been attempting to conceal their association. Further, all three acknowledged the threat posed by the men who had been watching them. Finally, in leaving Watson and Maffet to block the path of the officers as Bowles rushed on, the three evidenced a plan of flight suspicious not only as flight itself but also by the way it was executed.

██ Although flight alone will not provide probable cause that a crime is being committed, in appropriate circumstances it can supply the "key ingredient justifying the decision of a law enforcement officer to take action." *United States v. Vasquez*, 534 F.2d 1142, 1145 (5th Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976). "Flight invites pursuit and colors conduct" that might otherwise appear innocent. *United States v. Pope*, 561 F.2d 663, 668 (6th Cir. 1977); *see, e. g., United States v. Agostino*, 608 F.2d 1035, 1038 (5th Cir. 1979); *United States v. Wright*, 588 F.2d 189, 193 (5th Cir. 1979); *United States v. Vasquez, supra*, 534 F.2d at 1145; *United States v. Hall, supra*, 525 F.2d at 858–59.[12]

ni indicated that concealing the association with another person is an "obvious narcotic mule technique." As Agent Markonni stated: "If the person carrying narcotics is approached by the police, the other person just walks away; if a known narcotic[s] dealer is stopped by the police, then the other person just turns and walks away."

12. It is true that some cases have placed importance on the question whether the lawful authority of the officers was readily apparent to the fleeing suspect. *See United States v. Jones*, 619 F.2d 494, 497 (5th Cir. 1980); *United States v. Pope, supra*, 561 F.2d at 668. In other circumstances, there could be little question suspects knew that they fled from law enforcement officials. *See United States v. Agostino, supra*, 608 F.2d at 1038; *United States v. Hall, supra*, 525 F.2d at 858–59; *United States v. Jacquillon*, 469 F.2d 380, 385 (5th Cir. 1972), *cert. denied*, 410 U.S. 938, 93 S.Ct. 1400, 35 L.Ed.2d 604 (1973). This Court, however, twice has factored flight into its reasonable suspicion calculus in situations in which the authority of the pursuer was not readily ascertainable. *United States v. Wright, supra*, 588 F.2d at 193 (flight from unmarked car); *United States v. Vasquez, supra*, 534 F.2d at 1145 (same). Moreover, involved here was not the same sort of situation present in *Jones, supra*. In *Jones* a lone black male on foot was pursued by two deputy sheriffs in an unmarked car in Brunswick, Georgia. Bowles' encounter with the officers took place on the busy concourse of a major metropolitan airport.

Even were we to determine that the fact of Bowles' attempt to flee itself could not be considered as contributing to the reasonable suspicion of the two officers, we believe the manner of Bowles' flight is a matter of import. The experience of Agent Dorsett and Detective Glover reasonably led them to believe that the same two men who had acted as if they did not know of Bowles' presence and later acted in concert with him purposely blocked the path of

Examining the circumstances in their totality, it is clear that the officers possessed "specific articulable facts" and rational inferences sufficient to give them reasonable suspicion of criminal activity.[13]

## III.

The magistrate found the stop of Bowles to have been unconstitutional but nevertheless held the evidence admissible as the product of a consent search that dissipated the taint of the constitutional violation. *See United States v. Mendenhall, supra,* —— U.S. at ——, 100 S.Ct. at 1887 (White, J., dissenting). The district court affirmed this conclusion of voluntariness. *See* note 7 *supra.* Our task on appeal is somewhat easier for we have rejected the view that the strictures of the Fourth Amendment were in any way violated when Detective Glover detained Bowles for the limited purpose of requesting his identification and obtaining more information. Accordingly, there was no taint to be purged.

Unlike the situation in *Mendenhall, see id.* at ——, 100 S.Ct. at 1878, there can be no claim that Bowles did not voluntarily accompany the officers to the DEA office.[14] In the concourse Bowles indicated that he would consent to a search but suggested

that he would prefer that the search be conducted at some place other than in the public corridor. To this, Detective Glover indicated that the DEA office was available. When Agent Dorsett and Officer Brown approached with Watson and Maffet, they all proceeded in a group to the DEA office. Bowles at this time once again possessed his airline ticket and identification and had been subjected to neither physical threats nor any kind of display of force. *See id.* at ——, 100 S.Ct. at 1878.

■ Similarly, once they had arrived at the DEA office, the record presents no evidence suggesting that Bowles did not voluntarily consent to the search. Voluntariness is a determination to be made from "the totality of all the circumstances[,] *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 [93 S.Ct. 2041, 2047, 36 L.Ed.2d 854] [1973], and is a matter which the government has the burden of proving. *Id.* at 222 [93 S.Ct. at 2045], citing *Bumper v. North Carolina,* 391 U.S. 543, 548 [88 S.Ct. 1788, 1791, 20 L.Ed.2d 797] [1968]." *United States v. Mendenhall, supra,* —— U.S. at ——, 100 S.Ct. at 1879. Nevertheless, the determination is one of fact and will not be overturned on appeal unless it is clearly erroneous. *See, e. g., United States v. Troutman,* 590 F.2d 604, 606 (5th Cir. 1979) (per cu-

---

the officers in order to facilitate Bowles' escape. *See* note 11 *supra.*

**13.** We note that where, as here, the Fourth Amendment seizure is less intrusive than traditional arrest, determination of the reasonableness of that seizure "involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas, supra,* 443 U.S. at 50–51, 99 S.Ct. at 2640; *see United States v. Mendenhall, supra,* —— U.S. at ——, 100 S.Ct. at 1880 (Powell, J., concurring in part and concurring in the judgment); *Delaware v. Prouse, supra,* 440 U.S. at 654, 99 S.Ct. at 1397.

As Justice Powell noted in *Mendenhall,* the public interest in the apprehension of drug traffickers is "compelling." —— U.S. at ——, 100 S.Ct. at 1880 (Powell, J., concurring in part and concurring in the judgment). Moreover, the same people who had begun the DEA airport program in Detroit started the Atlanta program and patterned it specifically upon the program in Detroit. When they stopped Bowles, Agent

Dorsett and Detective Glover "were carrying out a highly specialized law enforcement operation designed to combat the serious societal threat posed by narcotics distribution." *Id.* at ——, 100 S.Ct. at 1881. (Powell, J., concurring in part and concurring in the judgment). Finally, the intrusion in the present case, a stop of a person for the purpose of identification, is indeed "quite modest." *Id.* at —— – ——, 100 S.Ct. at 1880–82 (Powell, J., concurring in part and concurring in the judgment).

**14.** Ms. Mendenhall was not told that she could refuse to accompany the officers to the DEA office and the record was devoid of any indication of what response, if any, she made when requested to leave the concourse area. *Id.* at ——, 100 S.Ct. at 1887 (White, J., dissenting). Nevertheless, a majority of the Court reversed the court of appeals and upheld the district court finding that Ms. Mendenhall went " 'voluntarily in a spirit of apparent cooperation.' " *Id.* at ——, 100 S.Ct. at 1879 [quoting *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968)].

riam); *United States v. Durham*, 587 F.2d 799, 800 (5th Cir. 1979); *United States v. Ballard*, 573 F.2d 913, 916 (5th Cir. 1978); *United States v. Gavic*, 520 F.2d 1346, 1351–52 (8th Cir. 1975).

■ In the present case, the finding that Bowles voluntarily consented to be searched was plainly not clearly erroneous. Bowles initially indicated on the concourse that he would consent to a search. In the DEA office Agent Dorsett explicitly informed the three suspects that they were not under arrest and were free to refuse consent to be searched. Bowles indicated that he understood his rights. Twice more, Agent Dorsett specifically informed Bowles that he was under no obligation to consent.

The circumstances clearly were not unduly coercive. None of the officers had displayed any weapons. Until the contraband was discovered Bowles was not placed under arrest or physically restrained. Moreover, as the Court in *Mendenhall* stated:

> Although the Constitution does not require "proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search," [*Schneckloth v. Bustamonte, supra*, 412 U.S.] at 234 [93 S.Ct. at 2051] (footnote omitted), such knowledge was highly relevant to the determination that there had been consent. And, perhaps more important . . . , the fact that the officers themselves informed [Ms. Mendenhall] that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive.

*United States v. Mendenhall, supra*, —— U.S. at ——, 100 S.Ct. at 1879. Three times Bowles was informed clearly of his right to refuse. At no time did he indicate any intention to exercise that right. To the contrary he "mumbled" something like "Yeah, um . . . . Go ahead."

Moreover, Bowles' physical actions alone would be sufficient to support the magistrate's finding of consent. Manifestation of consent can be by word or deed. *United States v. Fields, supra*, 458 F.2d at 1198;

*see United States v. Mendenhall, supra*, —— U.S. at ——, 100 S.Ct. 1870, 1878. Physically manifested consent has been held sufficient. *See, e. g., United States v. Almand*, 565 F.2d 927, 930 (5th Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978); *United States v. Freeland*, 562 F.2d 383, 384–85 (6th Cir.), *cert. denied*, 434 U.S. 957, 98 S.Ct. 484, 54 L.Ed.2d 315 (1977); *United States v. Fields, supra*, 458 F.2d at 1197–98; *see also United States v. Mendenhall, supra*, —— U.S. at ——, 100 S.Ct. at 1878. In light of the circumstances, Bowles' actions in standing and spreading his arms, thereby facilitating the search, constituted such a physical manifestation of consent.

AFFIRMED.

RONEY, Circuit Judge, concurring:

I concur with the decision that the evidence was admissible on the ground that, whether or not the officer's encounter with Bowles was a Fourth Amendment seizure, it was reasonable and not unconstitutional; and whether or not the search was otherwise unconstitutional, it was validated by consent.