**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Howard BERD and Robert Lee Dismuke,
Defendants–Appellants.**

No. 79–5688.

United States Court of Appeals,
Fifth Circuit.
Unit B

Jan. 22, 1981.

Rehearing Denied March 11, 1981.

Douglas N. Peters, Decatur, Ga., for Berd.

Ray C. Norvell, Decatur, Ga., for Dismuke.

Charles S. Saphos, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before MORGAN, ANDERSON and THOMAS A. CLARK, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge.

Appellants Howard Berd and Robert Lee Dismuke were jointly tried and convicted of possessing cocaine hydrochloride with intent to distribute it and of aiding and abetting

each other in the commission of that offense, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Prior to the trial appellants sought unsuccessfully to suppress the introduction of the cocaine on the ground that it had been obtained by Drug Enforcement Administration (DEA) agents in violation of appellants' Fourth Amendment rights. The principal issue on appeal is whether the district court erred in denying appellants' motion to suppress. Finding no error requiring reversal in this case, we affirm appellants' convictions.

I.

This case presents yet another chapter in the life of DEA Special Agent Paul Markonni.[1] At approximately 5:30 a. m. on June 22, 1979, Agent Markonni and Detective C. B. Denton of the Fulton County Sheriff's Department were on duty at Atlanta Hartsfield International Airport. While routinely observing passengers deplane from Delta Airline Flight 182, non-stop from Miami, Florida, the agents' attention was drawn to appellants Berd and Dismuke. The agents observed the appellants initially walk past the gate agent, then turn and approach the agent. Upon inquiry by Dismuke, the agent directed appellants to Gate 71-A as the departure gate for a continuing flight to Memphis, Tennessee. After receiving this information, appellants began to walk up the concourse. The agents noticed that Dismuke was carrying a brown plaid suit jacket and a brown briefcase and that Berd was carrying a brown leather and cloth totebag.

After appellants left the gate area of the incoming flight, Agent Markonni called the ticket agent at Gate 71-A and requested that he note the names under which appellants were traveling and whether there were any baggage claim checks attached to appellants' ticket envelopes. The ticket agent subsequently informed Markonni that appellants were traveling as "Robert Dis-

1. Agent Markonni has figured in a host of drug seizure cases that have come before this court. *United States v. Hill*, 626 F.2d 429 (5th Cir. 1980); *United States v. Robinson*, 625 F.2d 1211 (5th Cir. 1980); *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).

more" and "H. Bird," and that no baggage claim checks were attached to either ticket envelope. Upon receiving these names, Markonni obtained from Delta Airlines the reservation history of passengers Dismore and Bird. Markonni learned that reservations for a party of two had been made for these passengers at 12:10 a. m. on June 22 for a departure at 3:45 a. m. that same day from Miami to Atlanta, and continuing to Memphis. The reservation history also revealed that Miami telephone number 305–756–1072 had been given to Delta as a local call–back number. Agent Markonni, in an attempt to verify appellants' identities, dialed this number and received a recorded answer stating that 756–1072 had been changed to 681–0470. Markonni then called 305–681–0470 and spoke with a party who denied knowing either a Mr. Dismore or a Mr. Bird.

On the basis of this limited information Agent Markonni decided to approach appellants. He and Detective Denton walked to Gate 71–A where they observed appellants among a crowd of passengers awaiting the flight to Memphis. Appellants were seated side by side in chairs separated by a small table. Lying on the table were the jacket and briefcase which Markonni had previously seen Dismuke carrying.[2] Approaching the appellants alone, Agent Markonni leaned forward and, speaking only to Dismuke, identified himself as a federal officer and displayed his credentials. Markonni asked Dismuke if he might speak with him, and Dismuke agreed. When Markonni suggested that they step to a less crowded area in the concourse, Dismuke again indicated his consent. As Dismuke arose and started walking toward the concourse, Agent Markonni noticed that appellant had picked up only his jacket and was leaving behind the briefcase. When Markonni asked if Dismuke meant to leave his briefcase the appellant stated that the briefcase was not his. Markonni then asked if Dismuke wanted to tell the "other gentleman" where he was going. Dismuke responded that he did not know Berd.

After leading Dismuke to a point in the concourse where Detective Denton had been waiting, Agent Markonni asked if he could see Dismuke's airline ticket. Dismuke handed his ticket to Markonni, who verified that the ticket was issued to "Robert Dismore" and had no baggage claim checks attached. In response to Markonni's questions, appellant stated that his name was "Dismore" but indicated that he had no personal identification with him.

During this encounter Agent Markonni asked Dismuke a second time if the briefcase was his, and appellant again disclaimed ownership. Dismuke also again stated that he did not know and was not travelling with appellant Berd. However, when asked why his passenger reservation history showed a party of two travelling as "Dismore" and "Bird," the appellant, who appeared shaken, hesitated and then stated that he and Berd were acquainted but were not really travelling together.

At this point Agent Markonni indicated that he would be "right back" and, leaving Dismuke in the presence of Detective Denton, walked over to where Berd was still sitting. Markonni identified himself as a federal officer and asked if he could speak with Berd, who agreed. In response to Markonni's question, Berd denied traveling with or even knowing Dismuke. He also denied owning the briefcase that was lying on the table next to him. Following this exchange, Markonni asked if Berd would agree to step into the concourse area. As he was leaving with Markonni, Berd picked up the totebag he had been carrying and left the briefcase on the table. Markonni, following Berd, then picked up the briefcase.

When Agent Markonni and Berd arrived where Dismuke and Detective Denton were standing, Markonni again asked appellants if either of them owned the briefcase. Both appellants disclaimed ownership.

---

**2.** The agents testified that the briefcase was standing in an upright position with the jacket draped over it.

Markonni explained that he and Detective Denton were looking for narcotics passing through the airport and asked if they were carrying any drugs. When appellants stated that they were not, Markonni asked if they would consent to a quick search of their persons and property. Both appellants agreed to the search and, when given a choice of being searched in the concourse or in a nearby Delta office, accompanied the officers to the private office.

Once inside the office Agent Markonni advised appellants by reading from a card that (1) they had a right to consent or refuse to consent to a search, (2) that they had a right to consult an attorney before deciding, and (3) that any illegal objects found during the search would be used against them. Both appellants stated that they understood their rights and would agree to the search. A search of appellants and of Berd's totebag revealed no contraband. After appellants again denied owning the briefcase, Markonni opened the briefcase and found a quantity of cocaine within it. Appellants were then placed under arrest.

On the basis of these facts the magistrate recommended that appellants' motion to suppress be denied. Relying on *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980), the magistrate concluded that Markonni's initial approach of the appellants in the airport waiting area was not a Fourth Amendment stop or seizure since it did not involve force or excessive show of authority. The magistrate determined, however, that appellant Dismuke was seized at the point Markonni left him in the presence of Detective Denton, stating that he would be "right back," and that appellant Berd was seized when Markonni seized the briefcase after Berd indicated that it was not his. The magistrate

further found that the seizures of Berd and Dismuke were not based on a reasonable suspicion of criminal activity and, therefore, were unlawful. Nevertheless, because both appellants had abandoned the briefcase before they had been seized, the magistrate concluded that the search of the briefcase was not the product of an unlawful seizure and did not violate any rights protected by the Fourth Amendment. Furthermore, the magistrate found that appellants had freely and voluntarily consented to the search of their persons and possessions, thus purging the taint of the unlawful seizures. The district court entered a brief order approving the magistrate's report and denying the motions to suppress.[3]

## II.

The Supreme Court has repeatedly observed that the Fourth Amendment proscription against unreasonable searches and seizures "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). On the other hand, the Court has found it obvious that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1878 n. 16, 20 L.Ed.2d 889 (1968). Although these principles are simply stated, the task of deciding where a given police–citizen encounter falls on the spectrum between seizure and non–seizure is often a difficult one. Our burden has been made easier by a recent spate of "drug courier profile"[4] cases in this circuit that have further refined the seizure–non–seizure analysis. We now proceed to a discussion of these cases as they apply to the facts before us.

---

**3.** Because the district court adopted the magistrate's report and recommendation, we will refer to the "district court" when discussing the magistrate's finding and conclusions.

**4.** The drug courier profile is "an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." *Unit-*

*ed States v. Mendenhall*, 446 U.S. 544, 547, 100 S.Ct. 1870, 1873, 64 L.Ed.2d 497 (1980). The characteristics listed in the profile are discussed in *United States v. Ballard*, 573 F.2d 913, 914 (5th Cir. 1978) and in *United States v. Elmore, supra*, 595 F.2d at 1039 n. 3.

## A.

The threshold inquiry in this case, as in most drug courier profile cases, is whether the initial encounter between Agent Markonni and appellants in the airport gate waiting area constituted a seizure within the meaning of the Fourth Amendment. The government contends, and the district court found, that this encounter was merely a "police–citizen contact" and not a seizure requiring either probable cause or a reasonable suspicion of criminal activity. Although we do not accept entirely the district court's analysis of the issues in this case, we uphold the court's conclusion that the initial contact between the drug agent and appellants was not a seizure under the Fourth Amendment.

In two recent cases the Supreme Court has considered the Fourth Amendment issues arising from the use of a drug courier profile by federal agents to identify suspected narcotics carriers. In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), a majority of the Court found no Fourth Amendment violation where drug agents approached Mendenhall, who matched a number of profile characteristics, and asked to see her identification and airline ticket. The Court could not agree, however, on a single rationale for its decision. Two members of the Court–Justices Stewart and Rehnquist–concluded that the initial approach by the agents was not a Fourth Amendment seizure. Justice Powell, joined by the Chief Justice and Justice Blackmun, saw no need to reach the seizure question. Assuming that a seizure

had occurred, he concluded that the agents had acquired a reasonable suspicion of criminal activity and therefore were entitled to stop respondent. In *Reid v. Georgia,* —— U.S. ——, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), the Court found a Fourth Amendment violation where the profile characteristics relied on by a DEA agent as basis for stopping Reid fell short of establishing reasonable suspicion.[5] The question whether the agent's initial approach constituted a seizure had not been contested below and therefore was not addressed by the Court.

■ Because the Supreme Court has not resolved the proper standard for determining when a Fourth Amendment seizure has occurred during a police–citizen contact, we are bound by the standard adopted by this circuit in *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979), *cert. denied,* 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).[6] *United States v. Robinson*, 625 F.2d 1211 (5th Cir. 1980). In *Elmore* DEA agents observed Elmore engage in activity which corresponded with a number of the characteristics of the drug courier profile. On the basis of information which the court concluded failed to establish reasonable suspicion, the agents ·approached Elmore and asked to see his airline ticket. The court noted that the agents had not used force, physical contact, or any show of authority beyond identifying themselves as federal officers. Finding on these facts that Elmore was not compelled to continue the encounter and was reasonably aware that he was free to leave,[7] the court held that no

---

**5.** Because many of the drug courier profile characteristics are consistent with totally innocent behavior, the Court in *Reid* questioned the utility of the profile as a basis for establishing reasonable suspicion. *See also United States v. Ballard*, 573 F.2d 913 (5th Cir. 1978).

**6.** In *United States v. Bowles*, 625 F.2d 526, 532 n. 5 (5th Cir. 1980), the court suggested that the *Elmore* analysis had been seriously undermined by the court's opinion in *United States v. Santora*, 619 F.2d 1052 (5th Cir. 1980). We believe that any damage suffered by *Elmore* in *Santora* has been repaired by the more recent case of *United States v. Robinson*, 625 F.2d 1211 (5th Cir. 1980) and *United States v. Pulvano*, 629 F.2d 1151 (5th Cir. 1980). In these

latter two opinions the court has considered itself bound by the seizure analysis adopted in *Elmore*. We are not at liberty to ignore this clear precedent. We note, however, that we are. concerned that *Elmore* may be interpreted as sanctioning totally random stops by police officers. While this issue is not before us here, we observe that a policy of randomly stopping or approaching individuals poses a threat to cherished Fourth Amendment principles.

**7.** In *United States v. Mendenhall, supra,* 446 U.S. at 554, 100 S.Ct. at 1877, Justice Stewart proposed a reasonable man test for determining when a seizure occurs: "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the cir-

seizure occurred when the agents initially made their approach.

We find the facts of the present case to be indistinguishable from those in *Elmore*. When Agent Markonni approached appellants they were seated in the Delta Gate waiting area. Markonni identified himself to Dismuke as a federal agent and asked if he might speak with him. Dismuke agreed to this request and to Markonni's suggestion that they step to a less crowded area in the concourse. A similar series of events occurred when Markonni approached appellant Berd. As in *Elmore*, there was no use of physical force or contact and no show of authority other than the agent's identification of himself as a federal officer. "Such identification is insufficient to convert an encounter, otherwise regarded as outside the purview of the Fourth Amendment, into a *Terry* stop." *United States v. Elmore, supra*, 595 F.2d at 1042. We hold that under *Elmore* the initial approach by Agent Markonni did not intrude upon appellants' Fourth Amendment rights. Consequently, there was no requirement that the approach be predicated upon a reasonable suspicion of criminal activity.

### B.

The district court next determined that a seizure did occur subsequent to the initial encounter in the waiting area. Utilizing the *Elmore* analysis, the court concluded that at the moment Markonni indicated that Dismuke should remain with Detective Denton, Dismuke reasonably could have perceived that he was no longer free to leave. Similarly, the court found that Berd was seized when Markonni took the abandoned briefcase into his possession. The court then concluded that both seizures were unlawful because they were not based

upon the requisite reasonable suspicion. While we are willing to assume that the court correctly identified the precise points at which appellants were seized,[8] we are unable to accept its assessment that the agents lacked a reasonable suspicion of criminal activity.

In determining the legality of a particular seizure, a court must ascertain the facts known by the police officer "at the moment of the seizure." *Terry v. Ohio, supra*, 392 U.S. at 22, 88 S.Ct. at 1880. In this case the magistrate concluded that "when Berd and Dismuke were seized, the only nexus between them and drug trafficking was the fact that they had flown in from Miami which is considered to be the major distribution point for cocaine." This finding is clearly erroneous. Reviewing the record, we find that the magistrate overlooked certain evidence known by Agent Markonni prior to his initial contact with appellants and, more importantly, that he failed to consider the additional information obtained by Markonni between the time of the initial contact and the subsequent seizure.

At the suppression hearing Agent Markonni testified that prior to his initial approach appellants exhibited behavior he had personally found to be characteristic of drug couriers. First, appellants were travelling non–stop from Miami, Florida, a known distribution center for cocaine. Second, appellants arrived during the early morning hours, a time preferred by drug couriers because law enforcement staffing is usually at its lowest. Third, appellants carried little luggage, thus suggesting a quick turnaround trip, a practice frequently employed by couriers. Fourth, appellants' reservations had been made only 3½ hours before the 3:45 a. m. departure time, which

cumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." The *Elmore* court implicitly adopted the reasonable man test, and this standard has been utilized in subsequent opinions. *See United States v. Robinson, supra*, 625 F.2d 1211.

8. We hold as a matter of law that appellants were not seized prior to the points identified by the district court. *See United States v. Bowles, supra*, 625 F.2d at 531 n. 4 ("[t]he decision whether the Fourth Amendment is implicated by a particular police–citizen contact is a legal conclusion to be based on the 'facts appearing on the record. . . .' ").

986

Markonni deemed to be unusual. Fifth, appellants gave a false call–back telephone number to the airline, a practice commonly used by narcotics couriers to prevent later detection.

The more critical facts were discovered by Agent Markonni after his initial encounter with appellants but before the point where the district court found a seizure. During his conversation with Agent Markonni in the concourse, Dismuke repeatedly denied either ownership or knowledge of the briefcase which Markonni had previously seen him carrying. Furthermore, Dismuke denied knowing or traveling with Berd. This obvious attempt by Dismuke to disassociate himself from his fellow traveler and from the briefcase provided a quantum leap to the "articulable facts" known by Agent Markonni. Following Dismuke's denial that he knew Berd, Markonni asked him why his reservation history indicated a party of two traveling as "Dismore" and "Berd." Dismuke's reaction–he appeared "shaken" and hesitated before speaking–could only increase Markonni's suspicions. Finally, Dismuke's inability to produce any personal identification other than his airline ticket suggested to Markonni that Dismuke was attempting to conceal that he was travelling with an alias, a practice common to drug couriers. Berd's subsequent statement that he did not know Dismuke provided even more evidence that appellants were engaged in some form of nefarious activity.

We conclude as a matter of law [9] that the additional information acquired by Agent Markonni immediately prior to his seizure of appellants gave the agent reasonable grounds to suspect that appellants were engaged in criminal activity. Indeed, as did the court in *Elmore*, we conclude that, given the nature of the information, "[i]t would have been a failure of duty had the federal agents not detained [appellants] at that point in order to investigate further." *United States v. Elmore, supra*, 595 F.2d at 1039. Because the agent possessed a reasonable suspicion of criminal activity, the seizure of appellants did not offend constitutional principles.

## C.

In addition to finding that appellants cooperated with the agents prior to the point of seizure, the district court found that appellants voluntarily consented to accompany the agents to the airline office and voluntarily consented to the search of their persons and property. Voluntariness is a question of fact to be determined from the totality of all the circumstances. *United States v. Mendenhall, supra*, 446 U.S. at 557, 100 S.Ct. at 1879. The lower court's resolution of this question will not be reversed on appeal unless it is clearly erroneous. *United States v. Troutman*, 590 F.2d 604, 606 (5th Cir. 1979).

In this case the district court did not clearly err in finding that appellants voluntarily consented to accompany the agents and voluntarily consented to the search. While in the concourse the agents, without force or other coercion, requested appellants to submit to a search. Appellants promptly agreed to the request and, when asked if they preferred to be searched in a more private area, agreed to accompany the agents to an airlines office. Once inside the office Markonni advised appellants that they could refuse to consent to a search and that they had a right to counsel before making their decision. Appellants again manifested their consent. After reviewing the record, we conclude that the totality of the evidence in this case supports the district court's finding of voluntariness.

The district court next determined that although appellants had been unlawfully seized, appellants had "freely and voluntarily" consented to the search, thereby purging the taint of the unlawful seizures. Because we have held that appellants were not unlawfully seized by the narcotics agents, we need not review the court's finding on the attenuation question.

9. "Under the Fourth Amendment the determination of the reasonableness of a seizure is a conclusion of law." *United States v. Bowles, supra*, 625 F.2d at 533 n. 7.

## D.

After obtaining appellants' consent, the narcotics agents searched appellants and the totebag carried by Berd. The agents found no contraband during this search. Agent Markonni then asked appellants once again if either of them owned the briefcase he had retrieved from the area where they had been sitting. Both appellants denied owning the briefcase. Markonni then opened the briefcase and found a quantity of cocaine within it.

The district court determined that because both appellants had abandoned the briefcase *before* they had been seized by Agent Markonni, they forfeited any expectation of privacy in the briefcase. Consequently, the court concluded that no Fourth Amendment interests were implicated when the agents opened the briefcase. We agree with the court's assessment. In *United States v. Canady*, 615 F.2d 694 (5th Cir. 1980), this court held that Canady did not have a legitimate expectation of privacy in a suitcase after he repeatedly disclaimed ownership of it. The court ruled therefore that *Canady* could not on Fourth Amendment grounds challenge the search of the suitcase. We find that the facts in *Canady* are indistinguishable from those in the present case. Applying the *Canady* rule, we hold that appellants had no justifiable expectation of privacy in the briefcase and therefore could not object to its search.

Appellants suggest that an abandonment caused by an illegal seizure cannot preclude the assertion of Fourth Amendment rights. While we do not disagree with appellants on this point, we reject their argument that the abandonment of the briefcase was caused by an illegal seizure. As we have discussed above, no illegal seizure occurred in this case. Moreover, both appellants abandoned the briefcase *prior* to their seizures by the drug agents. Thus, even if the seizures were unlawful, they did not cause the abandonment.

## III.

In addition to his Fourth Amendment arguments appellant Dismuke alleges that the prosecutor's opening statement to the jury prejudiced his defense and that there was insufficient evidence to support his conviction. Appellant Berd argues that the district judge gave improper instructions to the jury. We have carefully reviewed the record as it pertains to each of these arguments. We see *no* merit to appellants' contentions, and therefore we affirm their convictions.

AFFIRMED.