UNITED STATES of America, Plaintiff-Appellee,

v.

Dennis Barnes McCRANIE, Defendant-Appellant.

No. 82–1053.

United States Court of Appeals, Tenth Circuit.

March 25, 1983.

Rehearing Denied May 12, 1983.

McKay, Circuit Judge, dissented and filed opinion.

Ken Ray Underwood, Tulsa, Okl., for defendant-appellant.

Kenneth P. Snoke, Asst. U.S. Atty., N.D. Okl., Tulsa, Okl. (Frank Keating, U.S. Atty., Tulsa, Okl., with him on brief), for plaintiff-appellee.

Before DOYLE, McKAY, Circuit Judges, and TEMPLAR, District Judge.[*]

WILLIAM E. DOYLE, Circuit Judge.

In this appeal from a criminal conviction in the Northern District of Oklahoma the defendant-appellant was charged with violating 21 U.S.C. § 841(a)(1), possession of cocaine with intent to distribute.[1] He seeks review in this court. He waived a jury and was tried on stipulated facts. On the basis of those facts, as well as the testimony in his motion to suppress hearing, McCranie was found guilty and received a three year sentence.

On the morning of September 22, 1981 McCranie was seen by narcotics agent Paul Markonni as he disembarked from the plane at the Atlanta airport. Markonni had not been looking specifically for McCranie. Instead he had been observing incoming passengers generally. Agent Markonni had been working at the Atlanta airport for approximately three years and had been with the DEA, or its predecessor agencies, a total of twelve years. Agent Markonni concluded that McCranie was acting in a suspicious fashion. He decided to observe

---

[*] Honorable George Templar, Senior District Judge, District of Kansas, sitting by designation.

1. 21 U.S.C. § 841(a): Except as authorized by this title, it shall be unlawful for any person knowingly or intentionally—1) to manufacture, distribute, or disperse, or possess with intent to

him further.[2] McCranie's flight had been to Atlanta from Fort Myers, Florida via Tampa, Florida, and he was catching a connecting flight to Tulsa, Oklahoma, where he alleged that he planned to visit his ex-wife and children.

Markonni obtained McCranie's name and travel plans from an airline agent from whom McCranie had obtained directions for his Tulsa flight. After observing passengers come in off another plane from Florida, Agent Markonni checked McCranie's reservation record, then went to the gate where McCranie was waiting for his Tulsa flight. There, Agent Markonni and another detective verified McCranie's ticket at the desk and learned that he was flying on a one-way ticket which he had purchased in his own name from a travel agent. They then saw McCranie looking out a window. Markonni apparently attempted to call the telephone number that McCranie had listed on his reservation record as his home telephone but, after getting only a busy signal, he decided to interview McCranie.

Markonni identified himself and sat in the seat right next to McCranie, who willingly produced his ticket and identification. He also answered Agent Markonni's questions. However, Markonni felt that McCranie was becoming more nervous as the interview progressed and for that reason he specifically asked McCranie if he was carrying drugs and if he would allow Markonni to search his person and luggage. McCranie had checked one suitcase through the airline. He refused Markonni permission to search his bag but apparently consented to a personal search.

Markonni quit questioning McCranie and ended their interview by telling McCranie to expect to be met by other agents in Tulsa. McCranie boarded his Tulsa flight. In the meantime Markonni went to the baggage facilities and identified McCranie's

suitcase and notified Agent Zablocki in the DEA office in Tulsa of his suspicion that McCranie had illicit drugs in his suitcase and described that suitcase for Zablocki. Markonni also contacted the sheriff's office in McCranie's home county and learned that McCranie had a criminal record which included arrests for sale and possession of narcotics, grand larceny, aggravated assault, and an entry regarding mental instability.[3] Markonni passed this information along to Agent Zablocki in Tulsa in a second phone call.

When McCranie arrived at the Tulsa airport, he rented a car, picked up his suitcase and headed outside, but before he reached the airport exit, Agent Zablocki called to him and then came over, identified himself and asked permission to speak with him. McCranie consented to speak with Agent Zablocki, so they moved to some seats nearby, accompanied by Lt. McDonald of the Tulsa police. Agent Zablocki read McCranie his *Miranda* rights. McCranie said he did not wish to have an attorney present. Both officers may have told McCranie that he was not under arrest. Zablocki requested a search of McCranie's suitcase, but the latter refused. Zablocki had a trained sniffing dog summoned. It arrived within two minutes. Meanwhile, three other uniformed policemen in addition to Agent Zablocki and Lt. McDonald positioned themselves in the general area. The dog, T.J., and its handler arrived and went through two search patterns which included McCranie's suitcase. Both times T.J. signalled by the luggage. McCranie had at this time been delayed less than ten minutes.

T.J. was trained to detect explosives. He had "graduated" first in his explosives sniffing class and had been reliable in 98.9% of explosives searches he had done in training. The times he had incorrectly signalled for explosives were when he had sniffed

manufacture, distribute or disperse, a controlled substance; ...

2. Markonni's testimony was that McCranie looked at him repeatedly while getting flight information from an airline agent. Markonni was dressed in civilian clothes, not a uniform.

3. The evidence in the record is not clear, but McCranie did admit there was an entry on his "rap sheet" regarding a "mental disability." [*See* Record, Vol. IV at 182, 199–200].

hidden drugs. T.J. had no drug-sniffing training, but did seem able to detect hidden drugs in informal tests his handler conducted. As the trial court observed, "He had minored in drugs and majored in explosives."

After T.J.'s signals, Agent Zablocki told McCranie they were going downstairs to the airport security office. A bomb technician took control of the suitcase along the way to the office. All the policemen and Zablocki accompanied McCranie to the office. He was allowed to call his attorney approximately fifteen minutes to an hour after entering the airport security office. McCranie asked if he was under arrest; he was told, "No," so he left.

Later, after obtaining a search warrant, the police x-rayed McCranie's suitcase for explosives. They found none, and so they opened the suitcase. Inside they found a white powdery substance, allegedly cocaine.

The trial judge held a full suppression hearing and after arguments by counsel he decided not to exclude the contents of McCranie's suitcase from trial.

The trial judge ruled that the detention in Atlanta was proper and that there was nothing wrong with Agent Markonni telephoning ahead to Tulsa to notify Agent Zablocki of his suspicions. He further found that the detention in Tulsa was proper and that the search warrant for McCranie's suitcase was issued on probable cause.

In this court McCranie contends that he was stopped and seized in Tulsa only on Agent Markonni's hunches; that there were no articulable, objective observations of his behavior that gave the police a reasonable suspicion that he had committed a crime. T.J.'s signals may have provided reasonable grounds to stop McCranie, but those signals came after McCranie had already been detained on insufficient grounds. The government argues that McCranie was not seized because a reasonable person in his circumstances before T.J. arrived would have believed that he was free to go. Even if McCranie was seized, all the circumstances gave Agent Zablocki adequate reason to hold McCranie temporarily, the government contends.

The issues are simple.

1. *Did the trial court properly admit evidence found in McCranie's suitcase? (a) Was he not "seized" during initial interviews so no Fourth Amendment rights were implicated, or (b), was he seized but on adequate grounds based on the agents' articulable suspicion?*

2. *Was the use of the dog to sniff McCranie's suitcase an illegal search?*

 If it is assumed that McCranie was seized during the questioning which occurred prior to T.J. sniffing the suitcase, the agents should have had a reasonable suspicion that McCranie was engaged in criminal activity. *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). If the limited questioning in Atlanta and Tulsa which preceded T.J.'s signals was instead only "police-citizen contact," a lesser standard might apply. *See United States v. Mendenhall,* 446 U.S. 544, 551–57, 100 S.Ct. 1870, 1875–79, 64 L.Ed.2d 497 (1980) (Stewart, J., concurring).

Other circuit courts have noted that the Supreme Court has not yet given lower courts a clear indication of when a "mere police-citizen contact" stops and a "seizure" implicating defendant's fourth and fourteenth amendment rights begins. *United States v. Black,* 675 F.2d 129, 132–34 (7th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); *United States v. Setzer,* 654 F.2d 354, 357 (5th Cir.1981); *United States v. Berd,* 634 F.2d 979, 984 (5th Cir.1981). Cases currently pending Supreme Court review may resolve this issue.[4]

---

4. *United States v. Place,* 660 F.2d 44 (2d Cir. 1981), *cert. granted,* 457 U.S. 1104, 102 S.Ct. 2901, 73 L.Ed.2d 1312 (1982), and *cert. denied, Place v. United States,* 457 U.S. 1106, 102 S.Ct. 2905, 73 L.Ed.2d 1314 (1982); *Royer v. State,* 389 So.2d 1007 (Fla.App.1979), *cert. granted,* 454 U.S. 1079, 102 S.Ct. 631, 70 L.Ed.2d 612 (1981); *United States v. Black,* 675 F.2d 129

■ We do not view this as arbitrary police harassment of innocent travelers. Rather, as we see it, these officers were very careful and did not rush into their investigation based on inadequate evidence. The trial court found that the detention by Agent Markonni in Atlanta was valid. Further, he found that the detention in Tulsa by Agent Zablocki was based on reasonable suspicion. The evidence favorable to the government supports the trial judge's denial of McCranie's motion to suppress. *United States v. Rios,* 611 F.2d 1335, 1344 (10th Cir.1979). McCranie was not "seized," so to speak, during the interview in Atlanta. Markonni questioned him in a public waiting area. *Compare United States v. Black,* 675 F.2d 129, 135 (7th Cir. 1982), *with United States v. Lara,* 638 F.2d 892, 894, 899 (5th Cir.1981) *and United States v. Jefferson,* 650 F.2d 854, 858 (6th Cir.1981).

The evidence does not disclose that there was overt display of police authority, *United States v. Mendenhall,* 446 U.S. 544, 551–57, 100 S.Ct. 1870, 1875–79, 64 L.Ed.2d 497 (Stewart, J., concurring); neither his wallet nor his ticket was seized, *Black, supra,* 675 F.2d at 140 (Judge Swygert, dissenting). The entire encounter in Atlanta took only a short time. As a result a reasonable person faced with the circumstances would not have been pressured or compelled to answer Markonni's questions, or isolated and restrained. *United States v. Regan,* 687 F.2d 531, 535 (1st Cir.1982); *Black, supra,* 675 F.2d at 135.

■ When the Atlanta interview occurred, Markonni initiated it based upon what he regarded as suspicious behavior. *United States v. MacDonald,* 670 F.2d 910, 913 (10th Cir.1982) (we are mindful that law enforcement officials have been exposed to special training and experience). Certainly Markonni's conduct tended to show this.

Before approaching McCranie, Markonni learned that he had used a one-way ticket to fly an unusual route out of Fort Myers. Despite Markonni's experience in spotting drug couriers, *United States v. Sentovich,* 677 F.2d 834 (11th Cir.1982); *United States v. Berd,* 634 F.2d 979, 981 n. 1 (5th Cir. 1981), it is argued that he did not have articulable grounds to seize McCranie. He did, however, have adequate reasons to initiate a police-citizen contact in order to verify his several suspicions. *See Mendenhall, supra,* 446 U.S. at 551–57, 100 S.Ct. at 1875–79. Since Markonni's brief questioning of McCranie went no further than that contact, it was proper and did not taint evidence obtained from McCranie in the subsequent police encounter. *Cf. Royer v. State,* 389 So.2d 1007, 1015 (Fla.App.1979), *petition denied State v. Royer,* 397 So.2d 779 (Fla.1981), *cert. granted* 454 U.S. 1079, 102 S.Ct. 631, 70 L.Ed.2d 612 (1981) (en banc decision by the Florida Court of Appeals that defendant's "consent" to search his luggage was tainted by seizure without probable cause).

In the interview which Markonni conducted he learned that McCranie was going to visit his children and ex-wife in Tulsa. Following his contact with McCranie in Atlanta, Markonni had learned that McCranie had a criminal record, including prior narcotic entries. There was also an entry regarding mental instability and there were recent entries for larceny. Also noteworthy was the fact that Markonni observed that McCranie became nervous when questioned about carrying drugs.

Markonni properly relayed what he had learned to Agent Zablocki in Tulsa. The trial judge concluded that Agent Zablocki had enough information concerning the defendant to provide him with suspicions adequate to detain McCranie in Tulsa and to summon the sniffing dog. In *United States v. Morin,* 665 F.2d 765, 768–69 n. 9 (5th Cir.1982) it was held that the defendant's

(7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); *United States v. Martell,* 654 F.2d 1356 (9th Cir.1981), *cert. denied* —— U.S. ——, 103 S.Ct. 3551, 74

L.Ed.2d —— (1983); *United States v. West,* 651 F.2d 71 (1st Cir.1981), *cert. granted* —— U.S. ——, 103 S.Ct. 3528, 74 L.Ed.2d —— (1983).

drug courier profile which included prior narcotics arrests gave authorities "the requisite information to justify an investigatory stop."

 The use of a sniffing dog is not a search or seizure. *United States v. MacDonald,* 670 F.2d at 910, 914; *see United States v. Waltzer,* 682 F.2d 370, 372–73 (2d Cir.1982). The court there said:

> "We regard the dog's designation of the luggage as itself establishing probable cause, enough for the arrest, more than enough for the stop .... The testimony indicated that the dog Kane had a record of 100 percent accuracy. Given that record of accuracy and the designation of luggage connected to Waltzer by independent evidence, the DEA agents did not have to stand helplessly by while Waltzer claimed the luggage and left the airport."

Here Zablocki could have had McCranie's suitcase sniffed without having reasonable suspicions that McCranie was engaged in criminal activity, although authorities must have some suspicion luggage contains contraband before it can be sniffed. *Waltzer, supra,* 682 F.2d at 372–73. In that case there was no illegal search of defendant's luggage when it was sniffed before defendant picked it up and before police reasonably suspected him of criminal activity. *United States v. Goldstein,* 635 F.2d 356, 361 (5th Cir.1981); Annot., 31 A.L.R.Fed. 932 (1977).

 Finally, McCranie was detained less than ten minutes in a public area near where he was first approached. From this it is possible to conclude that he was not actually seized in Tulsa until after the dog's signals gave officers probable cause. *United States v. Black,* 675 F.2d 129, 134 (7th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 945, (1983); *United States v. Berd,* 634 F.2d 979, 985 (5th Cir.1981). Even if McCranie was seized when Agent Zablocki asked permission to speak with him and advised of his rights under *Miranda, see MacDonald, supra,* 670 F.2d at 912, and the drug courier profile characteristics that had

been displayed by McCranie in themselves would not support the action taken in seizing him, *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980), those characteristics combined with his criminal record certainly did constitute sufficient evidence. *Compare United States v. Morin,* 665 F.2d 765 (5th Cir.1982) (successive stops based on the same information constitute a seizure not a mere contact) *with United States v. Berd,* 634 F.2d 979, 985 (5th Cir.1981). In the *Berd* case the agent's discoveries after he initially approached the suspected drug couriers gave him reasonable suspicion.

 The signals given by the dog certainly gave the officers reasonable suspicions that the bag contained contraband. Thus, they properly held McCranie's luggage until they could obtain a warrant to search it. The obtaining of the warrant is, of course, the bottom line. The officers exercised great care in handling the case and none of the happenings show any violation of the defendant's rights.

When Zablocki saw McCranie leaving the building with his luggage at the Tulsa airport, he was faced with the necessity of detention of McCranie for the brief amount of time it would take to complete investigating him by either gaining his consent to search the suitcase or by having the suitcase sniffed. It became necessary to follow the latter course. It turned out that it thwarted McCranie's illegal mission and it accomplished this without violating his rights under the fourth amendment. This is how the trial judge ruled following a hearing on McCranie's motion to suppress. His denial of that motion was proper and it is hereby affirmed.

McKAY, Circuit Judge, dissenting:

The bottom line of the seizure and subsequent search conducted in this case is the so-called "drug courier profile" routinely employed by drug enforcement officials. Use of the profile is a prime example of organized enforcement efforts that are rapidly eroding our protection against unwar-

ranted, arbitrary intrusions by public officials. This erosion is made easier since, in the isolation of the judiciary, we tend to see its impact only on wretched peddlers of misery like the one before us. The periodic intrusions on the rest of us—when, from time to time, our conduct fits the objective behavior relied on by these officers—tend to be lost or ignored when we assess the reasonableness of the conduct in cases like this one.[1] Even worse, the device ratified here not only readily lends itself to unreviewable racial bias but in all probability already incorporates and routinely employs it. *See United States v. Vasquez,* 612 F.2d 1338, 1353 n. 10 (2d Cir.1979) (Oakes, J., dissenting) (agent's testimony that race plays role in formulation of suspicion).

We know little or nothing about the characteristics that make up the profile. Nor do we know about the standards or criteria that guide an agent's application of it to particular individuals.[2] We have only broad, self-serving police assurances that reliance on the profile and the agent's judgment is well-founded.

In this case, we are told that suspicion was first aroused when the defendant, while getting flight information, looked repeatedly at the agent. I find that remarkable only in that it describes so many perfectly innocent people. We are further told that the defendant's flight was from Fort Myers, Florida via Tampa to Atlanta for a connecting flight to Tulsa, Oklahoma. That Fort Myers is a drug source city is equally unremarkable. If we are to believe the representations that parade before us, every city in the United States large enough to have a substantial public airport is a "drug source city." *See United States v.*

*Pulvano,* 629 F.2d 1151, 1155 n. 1 (5th Cir. 1980). To this we add that the defendant was flying on a one-way ticket—we are not told what percentage of innocent travelers fly one way—and that the agent saw the defendant looking out a window at the plane.

On this information, the agent initiated an interview in which he learned that this suspicious and devious man traveled under his own name and listed his home phone. He also learned that the defendant was going to Tulsa to visit his ex-wife and children. The defendant's nervousness is supposed to add some justification for the police conduct that followed. I strongly doubt, however, that even a federal judge would not appear nervous under similar circumstances, no matter how innocent his behavior. The agent then pressed the defendant about drugs and was refused permission to search his luggage. I know many people who resent unjustified police interference and who, like the defendant, lawfully would refuse permission to search their bags even though they contain nothing illegal.

After that interview, the agent notified counterparts in Tulsa of his "suspicions." During the defendant's flight to Tulsa, the agent learned of the defendant's previous arrests and of a "rap sheet" entry regarding a "mental disability." Record, vol. 4, at 199–200. In my opinion, the check of the "rap sheet" adds nothing in this case unless people who have previously been arrested are excepted from fourth amendment protection.[3] In addition, I am at a loss and alarmed that some justification for the intrusion seems to come from evidence that the defendant had a "mental disability."

---

1. Although the DEA apparently does not keep statistics, one agent has estimated that "an experienced agent can have a 60–70%" successful observation rate. Comment, *Reformulating Seizures—Airport Drug Stops and the Fourth Amendment,* 69 Calif.L.Rev. 1486, 1488 n. 11 (1981). Even without discounting for inexperience and the tendency to overstate one's successes, this estimate demonstrates that intrusions on innocent people are widespread.

2. What little we do know from this or other records is consistent with innocent behavior. *E.g., United States v. Pulvano,* 629 F.2d 1151, 1155 n. 1 (5th Cir.1980); *United States v. McCaleb,* 552 F.2d 717, 719–20 (6th Cir.1977).

3. The "rap sheet" check did reveal an earlier drug-related offense; however, there was only one such offense for which the defendant was arrested in 1969, twelve years before the airport confrontation in this case. Record, vol. 4, at 182.

While the contact in Atlanta, where the defendant readily identified himself, delivered his ticket, and answered questions, undoubtedly fits the euphemism of "inoffensive contact between a member of the public and the police," *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J., concurring), what happened in Tulsa cannot remotely be described as either a nonseizure or a reasonable intrusion.

As the defendant was about to leave the Tulsa airport, a DEA agent and a Tulsa police officer stopped him and took him back into the airport where they and three other uniformed officers strategically placed themselves to detain the defendant while they sent for a search dog. Even a casual observer of news events is aware of police shootings of "suspects." One in this defendant's place would be foolhardy to attempt to leave. Surely when we decide whether "a reasonable person would have believed that he was not free to leave," *id.* at 554, 100 S.Ct. at 1877, we do not wish by the standards we employ to encourage people to get shot or otherwise have violent encounters with the police. While the defendant was held for fewer than fifteen minutes before the dog "T.J." arrived, the detention clearly amounted to a seizure. It was intended to and did hold him until the dog arrived. *Cf. Dunaway v. New York*, 442 U.S. 200, 207 & n. 6, 99 S.Ct. 2248, 2253–54 & n. 6, 60 L.Ed.2d 824 (1979) (detention for custodial interrogation constitutes seizure). If any doubt as to whether the defendant was seized could exist, the lead agent's reading the defendant his *Miranda* rights lays it to rest. According to the testimony—and it would be embarrassing to suggest otherwise—the defendant was not then free to go. It is at that point that the basis for the police conduct must be measured. What the dog found is therefore irrelevant although certainly not without its own problems.[4]

**4.** T.J. was trained to sniff out bombs. We are of course told of his success record in ferreting out explosives even though we are carefully not told the success record of his counterpart who initiated contact in Atlanta. However, this was a search for narcotics—not explosives. It would strain credulity or worse to suggest that

Use of the "drug courier profile" seems to me to be a particularly invidious practice, especially when it is left to the shifting subjective vagaries of the individual officer. *See Vasquez*, 612 F.2d at 1352–53 & n. 10. We should not begin to ratify it until both its standards and its potential for abuse have been thoroughly scrutinized. My general concerns are more elaborately and articulately spelled out in the dissent of Judge Oakes in *Vasquez*, 612 F.2d at 1348–53. They seem to me equally supported by the Supreme Court's per curiam opinion in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

Since there was insufficient cause to justify the seizure, I would reverse the conviction.

the officer brought the defendant back into the airport to detain him around other passengers for a period of time if they remotely suspected a bomb. Thus, it is at best questionable whether the dog's signaling could reasonably be relied on to justify any further detention.