# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-4061

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Yiu-Pong Liu, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: April 20, 1999
Filed: June 10, 1999

_____

Before BOWMAN,[1] Chief Judge, FAGG, Circuit Judge, and BOGUE,[2] District Judge.

_____

BOWMAN, Chief Judge.

The United States appeals from the order of the District Court approving without further analysis the Report and Recommendation of the Magistrate Judge to whom

_____

[1] The Honorable Pasco M. Bowman stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on April 23, 1999. He has been succeeded by the Honorable Roger L. Wollman.

[2] The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

pretrial motions had been referred, thereby sustaining Yiu-Pong Liu's motion to suppress evidence and statements as illegally obtained. We reverse.

The facts of the case are essentially without dispute. On the morning of August 28, 1998, drug interdiction detectives Dan Wilson and George Barrios of the Kansas City, Missouri, Police Department boarded an Amtrak train en route from Los Angeles to Chicago at its regularly scheduled stop in Kansas City. As they made their way through the coach cars of the train, Barrios spotted a black suitcase in the overhead storage rack that appeared to be brand new, with a blank name tag and two luggage keys still attached to the handle of the bag. The suitcase fit the profile, Barrios believed, of a drug courier's bag. Barrios lifted the suitcase and found it unusually heavy. Leaving the bag in the overhead rack, he felt the exterior and identified a solid object that he thought was a bundle of illegal drugs. Barrios moved the bag to the seat just behind the seat where Liu appeared to be sleeping and he began asking passengers if the bag belonged to any of them. When no one claimed the suitcase, Barrios moved it to the aisle and woke Liu to ask if the bag belonged to him. Liu, appearing nervous, grabbed the handle of the bag and said that it was his. Barrios identified himself as a police officer and asked Liu if he understood. Liu said that he did. Barrios then asked again if the suitcase in fact belonged to Liu, or if his suitcase might not be a similar-looking bag still in the rack directly over his seat. Liu partially unzipped the bag that Barrios had placed in the aisle and pulled out a piece of clothing, took a pair of sunglasses out of a side pocket, and confirmed that the bag was his.

At this point, Barrios asked Liu for permission to search the suitcase for narcotics, and he consented. As Barrios began to unzip the bag, Liu revoked his consent to search and zipped the bag back up. Barrios then asked Liu for his train ticket. At that, Liu walked past Barrios and off the train without responding to Barrios or attempting to take the bag with him. Barrios and Wilson permitted him to do so, but Barrios advised other members of the interdiction squad by radio that a suspect who had refused a search of his luggage was leaving the train. Wilson followed Liu off the

train, and heard him say he was looking for a woman. Liu began walking toward the terminal. His pace quickened and he largely ignored Wilson's attempts to have a conversation. He then turned as if to return to the train. But as another detective approached, Liu turned back toward the terminal and started to run. Wilson seized him and handcuffed him.

In the meantime, Barrios took the bag to the common luggage area of the coach car and had a police dog sniff the suitcase for drugs. The dog alerted to the bag and Liu, already detained by Wilson, was arrested. In a conference room at the station, Liu consented to a search of his bag, which revealed a credit card embossing machine and magnetic decoding device (but no drugs). The detectives also found counterfeit credit cards that he had concealed in the waistband of his pants. He was charged in two counts with knowingly, and with intent to defraud, having control and custody of and possessing device-making equipment, in violation of 18 U.S.C. § 1029(a)(4), (c)(2). Liu filed a motion to suppress evidence and statements as illegally obtained.[3] The motion was sustained in November 1998. The government appeals.

The Magistrate Judge recommended suppression of the evidence, concluding that Barrios had conducted an unconstitutional search of the bag by feeling it as he did without reasonable suspicion and that Liu was seized, when he "attempted to avoid" the detectives, without reasonable suspicion or probable cause, that is, illegally. Report

_____

[3]Neither the Magistrate Judge in the Report and Recommendation nor the parties in their briefs separately analyzed the law applicable to the statements that were the subject of the suppression motion, or even identified what those statements were. As far as we can tell from the record, Liu made the statements at issue after he had been arrested and read his rights, after his luggage had been opened and searched with his consent, and after the counterfeiting devices had been found. We therefore understand Liu's argument to be that both the statements and the evidence should be suppressed on the same basis: as "fruit of the poisonous tree." The analysis that follows therefore applies to the statements as well as to the evidence.

and Recommendation at 11. The court also rejected the contention that Liu forfeited his right to challenge a search of his bag by abandoning it.

We take up the abandonment issue first because our resolution of the question could make it unnecessary for us to decide the other issues on appeal. See United States v. Washington, 146 F.3d 536, 537 (8th Cir. 1998). If Liu abandoned his bag, then the evidence obtained from the subsequent consensual search of the bag and the statements he made are not "fruit of the poisonous tree" but are admissible at trial. We review the District Court's factual finding regarding abandonment for clear error. We will affirm the court's decision that Liu did not abandon the suitcase unless the finding is "unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997) (citations to quoted cases omitted), cert. denied, 118 S. Ct. 721 (1998).

When a person abandons his luggage, his expectation of privacy in the property is so eroded that he no longer has standing to challenge a search of the luggage on Fourth Amendment grounds. See id. In determining whether property has been abandoned for Fourth Amendment purposes, the court must look to the totality of the circumstances, noting in particular two factors: whether the suspect denied ownership of the property and whether he physically relinquished the property. See United States v. Landry, 154 F.3d 897, 899 (8th Cir. 1998), cert. denied, 119 S. Ct. 836 (1999). Further, "[w]hether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent." Tugwell, 125 F.3d at 602.

It is without dispute that Liu never verbally denied ownership of his bag; indeed, he affirmed his ownership more than once. But he nevertheless may have abandoned the bag by physical relinquishment, even while claiming ownership, since a verbal disclaimer of ownership is not required for a finding of abandonment. See, e.g.,

California v. Hodari D., 499 U.S. 621, 624 (1991) (noting that drugs discarded by defendant while running from officer would be considered abandoned, if defendant at the time of abandonment was not seized within the meaning of the Fourth Amendment); Landry, 154 F.3d at 899 (holding that district court's finding of abandonment was not clearly erroneous where defendant placed paper bag on the ground behind wheel of garbage dumpster and walked to pay phone fifty feet away). We conclude that the District Court clearly erred when it considered the facts relating to physical relinquishment and found that Liu did not abandon the bag.

The court noted three circumstances that it considered in reaching its decision. First, the court said, Liu "was not free to take his bag with him when he exited the train." Report and Recommendation at 12. While this may be true, the detectives never told him as much, and he never made the slightest attempt to take the bag. As far as Barrios and Wilson knew, Liu believed he could leave with the bag, but he walked off without making any effort to take it, leaving it in a public place. That the detectives may not have allowed him to take the bag, had he tried, is beside the point; it simply has nothing to do with the behavior Liu displayed to the detectives.

The court also relied on the fact that Wilson heard Liu say he was looking for a woman as he left the train, noting that a "reasonable inference" is that he was planning to return. Id. We fail to see how leaving the train to look for a woman gives rise to an inference that he was planning to return; it seems just as likely that he intended to make his escape with the woman's assistance, if indeed such a woman existed. But reasonableness aside, it was clear error for the court to find that Wilson inferred that Liu intended to return to the train when it is apparent from Wilson's testimony (with no indication that the court found his testimony not credible) that he inferred quite the contrary based on the objective facts available to him: Liu was fleeing the premises. See Transcript of Suppression Hearing at 38 (Testimony of Dan Wilson) ("[T]here was a reasonable suspicion at that point because of his actions on the train when Detective Barrios was talking to him, and I observed this, and he just up and left his bag and

-5-

walked off and said he was looking for a woman. That was suspicious to me and that's why I followed him."). The inference suggested by the Magistrate Judge goes to Liu's subjective intent, whatever it may have been, and is not an objective fact known to the detectives; thus it is not relevant to the inquiry.

Finally, the court stated that "[t]he officers prevented defendant from returning to the train (and his luggage) when they seized and handcuffed him." Report and Recommendation at 12. This is a clearly erroneous finding. Liu had already walked away from the bag and, when he was seized, he had started to run – not in the direction of the train, but away from it. Such behavior is not indicative of an intent to return. Because Liu was running away from the train when seized and was not stopped as he was trying to make his way back to his luggage, it follows that the seizure did not prevent him from returning to the train and his luggage. "[I]n light of the entire record, we are left with a firm and definite conviction that a mistake has been made." Tugwell, 125 F. 3d at 602 (citation to quoted cases omitted).

Further, the court in its abandonment analysis failed to note other objective facts known to the detectives and so did not consider the totality of the circumstances. For example, Liu had claimed ownership of a suitcase that fit the profile (determined by visual examination alone) of the sort of bag often used by drug couriers. He gave his consent for Barrios to search the suitcase, but then revoked it as the search began. When Barrios asked to see Liu's ticket, he walked off the train without responding and without even attempting to take the suspicious bag. Further, from his first encounter with the detectives he appeared unusually nervous. These are among the relevant objective facts known to the detectives who determined that Liu had abandoned the bag, and all such facts should have been considered by the District Court. See Landry, 154 F.3d at 899 ("[W]hether [defendant] intended to retrieve the bag, leave the bag for another person, or abandon the bag is not relevant to the issue of whether the objective facts available to the officers support a finding that [defendant] abandoned the bag.").

We conclude that the court's finding that the bag was not abandoned is unsupported by substantial evidence and therefore is clear error.

Liu argues that his failure to take the bag when he left the train was not an abandonment within the meaning of the Fourth Amendment because it was not voluntary, that is, it "resulted from a Fourth Amendment violation by manipulating a bag in a manner to determine the contents without visual inspection." Brief of Appellee at 11. It is true that "abandonment cannot be the product of unlawful police conduct." United States v. Segars, 31 F.3d 655, 658 (8th Cir. 1994), cert. denied, 513 U.S. 1099 (1995). We need not reach the question of whether Barrios's "manipulation" of the bag was unconstitutional, however. For even if the abandonment followed an unlawful search, it was not an involuntary abandonment if it "was a voluntary act of will that independently legitimated the subsequent search." Washington, 146 F.3d at 537. Liu's detention on the train was consensual, and he was permitted to leave the train when he wanted to. He was not seized until he began to run, having already left the bag behind. His abandonment was not "tainted in the constitutional sense" notwithstanding that Barrios asked him about the bag and Wilson followed him off the train. Id. "The existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary." Segars, 31 F.3d at 658 (quoting United States v. Jones, 707 F.2d 1169, 1172 (10th Cir.), cert. denied, 464 U.S. 859 (1983)). We conclude, as did this Court in similar circumstances in Washington, that Liu's abandonment of his bag (and with such abandonment his forfeiture of any Fourth Amendment rights he had to challenge a subsequent search of the bag) was "a voluntary decision of his own free will." Washington, 146 F.3d at 538.

In sum, we hold that the District Court clearly erred in finding that Liu did not voluntarily abandon his bag. We therefore need not and do not reach the question of the constitutionality of the exterior "manipulation" of the bag or of the seizure of Liu after he began to run away from the train. The judgment of the District Court

sustaining the motion to suppress is reversed and the case is remanded for further proceedings.

BOGUE, District Judge, dissenting.

The majority avoids ruling on whether the manipulation of Liu's bag amounted to a warrantless search. The majority does so based on its conclusion that an investigating officer viewing this series of events would believe that Liu intended to abandon his property, and that the District Court's opposite conclusion was "unsupported by substantial evidence." United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997) (citations omitted), cert. denied, – U.S. –, 118 S. Ct. 721, 139 L.Ed.2d 661 (1998). The majority relies on Washington for the proposition that a voluntary abandonment of one's property can render one ineligible to complain about an earlier purported search. See United States v. Washington, 146 F.3d 536 (8th Cir. 1998). Based on this holding, the majority defers any analysis of the legality of the initial encounter in which Detective Barrios lifted Liu's bag, felt it, removed it from the overhead compartment, placed it on the seat beside Liu, felt it again, and then placed it on the aisle floor.

Evidence seized as a direct product of a Fourth Amendment violation must be suppressed. Wong Sun v. United States, 371 U.S. 471, 484, 83 S. Ct. 407, 415, 9 L.Ed.2d 441 (1963). The "fruit of the poisonous" tree doctrine, however, is not an absolute one, for if the evidence in question is sufficiently attenuated from the primary taint of the illegal search, the evidence may still be admissible. Taylor v. Alabama, 457 U.S. 687, 691, 102 S. Ct. 2664, 2267, 73 L.Ed.2d 314 (1982). An intervening act, for example, may sufficiently disconnect the taint (illegality) from the fruit (evidence). See, e.g., United States v. Nooks, 446 F.2d 1283, 1288 (5th Cir. 1971) (disregarding the illegality of the defendant's initial arrest when he subsequently fled at 115 m.p.h. and fired three shots directly at the sheriff, justifying a search of his automobile's trunk

which revealed a box of money and two co-defendants), cert. denied, 404 U.S. 945, 92 S. Ct. 299, 30 L.Ed.2d 261 (1971).

Abandonment may in some cases qualify as such an intervening act. In Washington, when the defendant expressly denied ownership of his luggage, he "made a voluntary decision of his own free will: He had not been informed that he was a target, nor did the officers seize him prior to his first denial of ownership of the bag." Washington, 146 F.3d at 538. Once Mr. Washington's property was abandoned, the subsequent search/seizure of it impinged no privacy interest. Id. at 537, citing United States v. Sanders, 130 F.3d 1316, 1317-18 (8th Cir. 1997); see also Tugwell, 125 F.3d at 602. Because Mr. Washington's unequivocal abandonment was unrelated to the officer's previous manipulation of his bag, this Court had no occasion to analyze its "grave doubts about the constitutional propriety" about the warrantless manipulation of the bag. Washington, 146 F.3d at 537.

The degree of Wong Sun attenuation between the evidence and challenged government action turns on several factors, including the temporal distance between the taint and the fruit, an intervening event (such as the independent act of abandonment in Washington) which dissipates or purges the taint, and the seriousness of the fourth amendment violation. Dunaway v. New York, 442 U.S. 200, 219, 99 S. Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); United States v. Ceccolini, 435 U.S. 268, 274-75, 98 S. Ct. 1054, 1059, 55 L.Ed.2d 268 (1978); Brown v. Illinois, 422 U.S. 590, 604-05 95 S. Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975); United States v. McGill, 125 F.3d 642, 644 (8th Cir. 1997); see also Josephine R. Potuto, "A Practitioner's Primer to the Fourth Amendment," 70 Neb. L.Rev. 412, 441 (1991). The Supreme Court has declared that "*particularly*, the purpose and flagrancy of the official misconduct" is to be considered in a court's inquiry into the causal connection between the evidence and the challenged search. Dunaway, 442 U.S. at 218, 99 S. Ct. at 2259 (considering the connection

between an illegal arrest and subsequent confession), quoting Brown, 422 U.S. at 605, 95 S. Ct. at 2262 (emphasis supplied).[4]  Here, this was not done.

In the present case, Liu left his seat, ostensibly to meet a female acquaintance on the railway platform, and a Kansas City Police Officer followed close on his heels, badgering him with questions.  These questions were undoubtedly triggered by suspicions about the possible contents of Liu's bag, suspicions directly linked to the challenged government action of touching his bag to discern its contents.[5]  As Liu disembarked and looked around, he explained to Officer Wilson that he was looking for a woman.[6]  Officer Wilson doggedly followed close behind. When plainclothes

_____

[4] The "attenuation inquiry" is employed in cases where the defendant consents to a search following an illegal arrest, and it also applies to cases of abandonment following an illegal search or seizure.  See, e.g., United States v. King, 990 F.2d 1552, 1563-65 (10th Cir. 1993); United States v. Berd, 634 F.2d 979, 986-87 (5th Cir. 1981). King also notes that review of this inquiry is for clear error.  King, 990 F.2d at 1564.

[5] Cf. Wong Sun, 571 U.S. at 488, 83 S. Ct. at 417 (phrasing the question as whether the evidence was "'come at by exploitation of that illegality'") (citation omitted).

[6] It is unclear from the record whether the destination point of Liu's train ticket (assuming he had one) was the station where he got off the train.  Obviously, if Liu disembarked at his journey's endpoint, his decision to leave his bag behind points toward an intent to abandon.  If his train ticket gave him passage to a further point, on the other hand, his hurried pace could be more objectively perceived as a rush to find the woman before the train re-boarded.  The fact that this evidence is not in the record, in my opinion, does not allow us to pay any less deference to the Magistrate's findings.
I am especially troubled by the majority's rejection as irrelevant the fact that Liu stated that he was disembarking to meet with someone.  When Liu began to walk away from the officers, they might have believed that he was trying to escape from an uncomfortable encounter with law enforcement and abandon his bag to their scrutiny. The reasonableness of this belief would have been eroded to some extent when Liu explained that his intent was otherwise.  Criminal minds will often concoct excuses which officers may reasonably find unbelievable, but this fact also underscores the

Officer Quinlan, who did not identify himself as a police officer, moved to intercept Liu, Liu attempted to run but was immediately grabbed, handcuffed, and "seized" for purposes of the Fourth Amendment.

Clearly, Liu's actions, whether or not they must be read as communicating an objective intent to abandon his bag back on the train, were not the same "voluntary decision of . . . free will" as that of Mr. Washington's uncoerced verbal relinquishment. Washington, 146 F.3d at 538. Moreover, the circumstances giving rise to Liu's "abandonment" were not unconnected from the challenged search. Thus, more analysis is required into whether the initial manipulation of Liu's bag was "sufficiently attenuated" from his actions which the Court today construes as effecting an abandonment.

Part of this inquiry should require an examination of the "flagrancy of the official misconduct." Dunaway, supra. Instead, the majority avoids weighing the "flagrancy" – along with the potential illegality – of the manipulation of Liu's bag, and shoehorns the Magistrate's unchallenged findings into the approach taken in Washington, where the defendant freely abandoned his property in circumstances unrelated to the challenged manipulation. Washington turned on its own facts, it did not establish a talismanic rule that an illegal search is retroactively "cured" whenever the defendant subsequently panics and abandons his or her property.[7]

---

deference due to a trial court's credibility assessments which are essentially beyond the scope this Court's review on appeal.

[7] Washington relied on United States v. McGill, 125 F.3d 642 (8th Cir. 1997), cert. denied, – U.S. –, 118 S. Ct. 1108, 140 L.Ed.2d 161 (1998) and United States v. Thomas, 83 F.3d 259 (8th Cir. 1996), neither of which assist us in the present case. Both involved consent to a search which was determined "sufficiently an act of free will to render the search valid." Washington, 146 F.3d at 538. Neither case involved an abandonment arising out of a challenged search. Consent and abandonment are similar, but not identical issues.

I dissent in order to raise a serious question about the majority's failure to adequately assess whether we can in fact detour around the challenged search and the related question of whether there is a reasonable expectation of privacy that luggage placed directly overhead on a public train will not be touched, pressed, felt, and removed in the manner in which it occurred here. In my view, we should carefully assess the degree of connection between the challenged search and the act of abandonment. Given the proximity and relatedness between the two in this case, it becomes necessary to examine the legality of the officer's touching and feeling of the defendant's bag. Because this bears on whether we can bypass the search issue altogether, it is a critical piece of the puzzle. In order to resolve whether Liu's subsequent act of abandonment was an intervening circumstance which insulates the state's manipulation of his bag from Fourth Amendment attack, we should first assess the legality (and "flagrancy") of that manipulation. Omitting this inquiry places the proverbial cart before the proverbial horse.

Under the facts of this case, I would follow this suggested analysis down the following path. First, I would conduct a reasonable expectation of privacy inquiry and conclude that Detective Barrios's manipulation of Liu's bag was clearly unconstitutional. See United States v. Nicholson, 144 F.3d 632, 639 (10th Cir. 1998); United States v. Most, 876 F.2d 191, 195 (D.C. Cir. 1989); compare United States v. Gault, 92 F.3d 990, 992 (10th Cir. 1996) (concluding that officer's kicking and lifting of a bag left protruding five inches into the aisle on a train did not constitute a search). Next, even assuming that Liu's subsequent actions clearly evidenced an abandonment, I would conclude that such acts, arising from a flagrant violation of the Fourth Amendment, cannot be construed as voluntary acts of will that independently legitimized the search. See Washington, 146 F.3d at 537. Therefore, I would affirm the District Court's order suppressing the illegally obtained evidence and statements, and for this reason, I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.